FILED
IN CLERKS OFFICE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS 2019 MAY -6  AM 10: 40

U.S. DISTRICT COURT
DISTRICT OF MASS.

JOHN DOE,

        Plaintiff,

    v.

BRANDEIS UNIVERSITY and THE
COMMONWEALTH OF
MASSACHUSETTS,

        Defendants.

Civil Action No. _____

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff John Doe (hereinafter "John"),[1] acting *pro se*, files this Complaint and in

support thereof alleges the following:

### I.    NATURE OF THE ACTION

1.    This case arises out of actions taken by Defendants Brandeis University

("Brandeis" or "the University") and the Commonwealth of Massachusetts

("Commonwealth") concerning false allegations of sexual misconduct made against John,

a male student at Brandeis with an unblemished academic, disciplinary and criminal

record, by a female student in his doctorate cohort referred to herein by the pseudonym,

"B.K."

2.    John and B.K. met on August 10, 2015, while participating in a statistics

bootcamp that preceded the fall semester of their cohort's first year at Brandeis. The two

expressed no intimate feelings toward one another as they began their doctorate program.

---

[1] Contemporaneously with this Complaint, Plaintiff has filed a Motion for Permission to Proceed under
Pseudonym.

3.      After their Fall semester had commenced, B.K. began to host a series of informal social gatherings for the Ph.D. cohort. John did not attend any of these events.

4.      At the start of the Spring semester in January 2016, B.K. approached John in one of their joint classes to jokingly complain of the work she had put into organizing the previous social events and to question him as to his failure to attend them. Feeling somewhat guilty for his acknowledged aloofness, John agreed to attend the next planned event.

5.       The next event would be on March 9, 2016, at B.K.'s apartment. John had arrived to find approximately eight to ten of his fellow cohort members in attendance, nearly half had left within an hour or two of his arrival. During his visit, B.K. had continuously fed him alcoholic beverages and, because the two resided within walking distance of each other, John did not read too much into it.

6.      When B.K. could sense that John was noticeably intoxicated, however, she suggested that he remain so that she could cook him something to eat in order to absorb the alcohol. John accepted the offer and when the last student had left, John and B.K. had sexual intercourse.

7.      The following morning John left B.K.'s apartment and the two never discussed the activities that had taken place just the night before. In April, B.K. had experienced a birthday and she did not spend it with John. The two were not in a dating relationship.

8.      Also, in April 2016, the Spring semester had ended and the two would not talk again until Fall 2016 when classes commenced.

9.      In August 2016, B.K. initiated contact with John to ask if he would register for a

class that was low in enrollment. In exchange, she would assist him with promoting a

community event on which he was working. John agreed.

10.     While John had decided to remain cordial with B.K. because of their collegiate

relationship within the cohort, he could detect escalating mood swings towards him from

B.K. He confronted her on those mood swings in August 2016 but she declined to

address them, stating that that's why she sees a psychiatrist. The relationship between the

two was ultimately reduced to text communication and casual conversation during class.

11.     In October 2016, B.K. coordinated another social event for the cohort. This time

it was held at a bar and grill venue and B.K. offered to give John and two other students a

ride. John accepted.

12.     During this event, B.K. abruptly exited the bar and grill. Not knowing if she was

returning or whether he would need to find another means of transportation from the

event, John texted her several times. She did not respond.

13.     At almost midnight, John found a ride home with another patron exiting the

venue.

14.     B.K.'s apartment is in route to the University for John. The following morning as

John was commuting to Brandeis he could see B.K. in her living room and rang her

doorbell. When she answered the door, he told her that while he did not know what was

going on with her, it would be best not to converse outside of the classroom. After this

brief exchange, John remained true to his word with keeping his distance from B.K.

15.     Approximately a week later, and with no provocation from John, B.K. contacted

Brandeis Police to make a claim that the University treated as sexual harassment. She

then, at the insistence of Brandeis, went into the Commonwealth of Massachusetts

District Court to request a domestic abuse order against John, which the court granted.

Four days later, the Commonwealth issued a complaint for abuse to a family or

household member against John.

16.     Brandeis immediately placed John on emergency suspension, banning him from

his classes and alienating him from Ph.D. faculty and colleagues, and on November 17,

2016—nearly four weeks after imposing its suspension—notified him that B.K.'s

accusation related to five alleged violations of student conduct set forth in Brandeis's

Rights and Responsibilities Handbook ("R&R Handbook"): sexual harassment/

misconduct (3.2), non-consensual physical contact (3.5), intimidation (3.9), threats

(3.10), and physical harm or unwanted contact (3.11) .

17.     On that same day, the University told John that it would press B.K.'s charges and

would adjudicate the case through the University's *informal* "Special Examiner's

Process" for sexual assault and sexual harassment cases—as opposed to the University's

long-standing Student Conduct "Hearing Process," or even the formal Special

Examiner's Process that afforded the accused the right to review by the University

Appeals Board.

18.     John was stunned by the accusation and charges, and the University's precipitous

response. He was never in a dating relationship with B.K., and never physically harmed

or sexually harassed her in any way.

19.     Nor was there a trace of physical or other corroborating evidence that John ever

physically harmed or sexually harassed B.K. there were no medical or hospital records,

911 calls, reports to Campus Police or law enforcement, reports of witnesses to any

incidents, or complaints by B.K. to friends, relatives, or Brandeis administrators prior to the alleged incident.

20.     Notwithstanding, John had retained private counsel on November 15, 2016, after being arraigned on a charge of assault and battery to a family or household member.

21.     During the next four months, John participated in the *informal* Special Examiner's Process under protest, both because he had a contractual right to have his case adjudicated through the University's Hearing Process, and because the Special Examiner's Process lacked the most basic elements of fairness and due process.

22.     The contrast between the Hearing Process and the *informal* Special Examiner's Process is stark. In the Hearing Process, the parties participate in a hearing before an impartial four-member tribunal. Both the accused and the accuser have the right to present evidence and witnesses and to question each other and each other's witnesses. There is a full and equal opportunity for both parties to hear the evidence and present their respective claims and defenses.

23.     In the Special Examiner's Process, the hearing is eliminated altogether. In its place, the University has created a secret, inquisitorial process, in which a single individual staffed within the University's Title IX team – the "Special Examiner" – conducts a closed-door investigation of the charges.

24.     The *informal* Special Examiner's Process applies even more inequitable standards of sexual conduct than its formal process. It provides the same harsh sanctions with no right to a review by the University Appeals Board.

25.     In both the formal and *informal* Special Examiner's Processes, the accused never has the opportunity to confront the accuser, question the witnesses, or present a defense at

a hearing. Because there is no hearing, the accused never knows what the accuser (or the accuser's witnesses) actually have said, but only knows what the Special Examiner chooses to tell him. In John's case, he was not told orally or in writing the factual bases for the charges against him at any time before or during the four months of the *informal* Special Examiner's investigation; instead, he had to try to piece together what in particular he was accused of doing from the questions posed to him by the Special Examiner.

26.     At the conclusion of the investigation, the Special Examiner prepares a Report, which includes the Examiner's findings of fact, conclusions as to credibility of the parties and witnesses, and recommended judgment. At the time of John's case, the accused was not permitted to read the Report but could only "listen" to a "summary" of the Report prepared by the single University administrator chosen as the final "decision maker."

27.     In John's case, at approximately 5:00 a.m. during finals week, the Special Examiner, the Title IX Investigator staffed at Brandeis, interviewed John without his attorney present, and subsequently found him responsible for all five charges.

28.     But it was only on January 10, 2019, after filing a Rule 14 Motion in the related criminal case, that John finally learned what specific conduct he was alleged to have engaged in as the basis for the University's charges and findings. The accusations were frivolous on their face, but the Special Examiner's findings were even more disturbing. They were based on notions of what constitutes sexual misconduct that bordered on the preposterous and logical only if viewed in a biased vacuum tube.

29.     For example, the preponderance of evidence standard was misapplied—the

Special Examiner acknowledged there were only two witnesses with direct knowledge of the October 20, 2016, event.

30.     To counter this, the Special Examiner's relied heavily on statements made by the friend of B.K. and the Brandeis police detective assigned the case who "conveniently" overheard John make a whispered incriminating statement to his attorney in court, while ignoring John's declaration of innocence and all but one of his witnesses.

31.     Next, while the Special Examiner's Report finds that John and B.K. were not in a dating relationship and provides not even a scintilla of evidence supporting a sexual misconduct determination, it is framed in such a manner to allow the final decision maker to draw that very conclusion.

32.     Third, the Special Examiner also made much to do about the time of John's visit without taking into consideration that the vast majority of Ph.D. students—including John and B.K.—study, converse and meet with each other at odd times of the day.

33.     Fourth, the Special Examiner's findings were inconsistent with B.K.'s claims. It is tantamount to an accuser saying, "he bumped into me," and the Special Examiner finding that "she was raped." B.K.'s statements, although spurious, was that John grabbed and shook her arm, chest bumped, and yelled at her, and the Special Examiner found that sexual misconduct had occurred.

34.     Fifth, the Special Examiner found that B.K. had no motive to fabricate her report, without acknowledging that B.K. had already fabricated statements within the Report regarding her account of the August 2016 incident with John.

35.     Finally, the Special Examiner erroneously found that John had intimidated B.K.,

yet the record reflects that she continued to attend classes with John after the alleged incident.

36.     Ultimately, John was sanctioned by the University with a Disciplinary Warning.

37.     A Disciplinary Warning requires the student to undergo education training to address the infraction. Much more importantly, the Disciplinary Warning means that the student's education record will reflect that the student was found responsible for the charges.

38.     In John's case, his education record will permanently reflect that he was found responsible for sexual misconduct toward another student involving non-consensual physical contact, sexually harassing and physically harming, intimidating and threatening a student. Brandeis has effectively labeled John as a predatory sexual offender.

39.     The adverse mark on John's permanent education record, stigmatizing him as a sexual offender, jeopardizes, if not shatters, his goal of teaching at the university level and resuming his career in government. John's ill-deserved disciplinary record will be a lifetime liability.

40.     Brandeis's *informal* Special Examiner's Process is a secret, inquisitorial process lacking the most basic due process safeguards for the accused and vests in a single person – the Special Examiner – the competing roles of investigator, prosecutor, and *de facto* judge.

41.     The Special Examiner's findings were arbitrary and capricious, and were inconsistent with B.K.'s claims, which lacked a shred of evidentiary support; the Special Examiner ignored John's witnesses, evidence, and the fact that he and B.K. both stated that they were not in a dating relationship.

42.    The Special Examiner ignored witnesses, documentation, and even B.K., in order to make a finding of responsibility against John – finding that sexual harassment had occurred even though B.K. made no such claim.

43.    The *informal* Special Examiner's Process as conceived by the University and as implemented in John's case was also deeply flawed because it applied inequitable standards of sexual conduct and inequitable processes that favored B.K. and discriminated against John in violation of Title IX of the Educational Amendments of 1972.

44.    John filed two complaints of discrimination charging Brandeis with violating Title IX during this process. The first one was with the Massachusetts Commission Against Discrimination ("MCAD"). MCAD declined to investigate this matter on John's behalf.

45.    John filed a second complaint with the Department of Education, Office of Civil Rights ("OCR"), the federal agency charged with regulating Title IX. The OCR has opened an investigation of Brandeis's handling of John's case in response to John's complaint filed with the agency. Upon information and belief, this is only the third case that the OCR has investigated on behalf of an accused student regarding possible violations by a college or university of principles of equity and fairness in connection with the investigation and adjudication of alleged sexual misconduct.

46.    In retaliation for John's Title IX complaints, Brandeis barred him from his workplace as a teaching assistant; and disrupted his coursework and multiple meetings with potential dissertation committee faculty that impeded his education. The University also conspired with the Commonwealth to circumvent his attorney representation and leak their internal investigation in furtherance of the criminal case.

47.     Brandeis is aware of B.K.'s defamatory statements to the state court and has aided and abetted them. Upon information and belief, Brandeis "leaked" the Special Examiner's finding to John's then-current employers and the Commonwealth or has failed to adequately safeguard the confidentiality of the findings as it is required to do under federal law. These violations directly resulted in John's being let go from his internship position working for the Department of Health and Human Services in the New England area, the withdrawal of employment references, and the withdrawal of employment offers.

48.     The Special Examiner's Process provides no checks or balances on the authority of a single individual – the "Special Examiner" – to conduct an inquisitorial, secret investigation and then to pass judgment on the accused as the single fact-finder and *de facto* adjudicator. The Process has no safeguards to prevent the Special Examiner from conducting a biased, incomplete, or incompetent investigation – as happened in John's case – and vests in one person the conflicting roles of investigator, prosecutor, and judge.

49.     Brandeis allowed John's classmate to weaponize the University's disciplinary processes for her own nefarious purposes, and aided and abetted her abuse of, not only its process, but also the state courts. The University accepted *carte blanche* the Special Examiner's findings, even though they could not be squared with the evidence, and elevated John's attempt to peacefully remove himself from a toxic individual into sexual and physical assault. By implementing this deeply flawed Process and permitting it to play out unchecked in John's case, the University has set a dangerous precedent that hurts all real victims of sexual and physical violence.

50.    As for the Commonwealth, it lacked a good faith basis in the four days it took to

bring charges against John as evidenced by the three-year delay with bringing this case to

trial. It also violated John's rights afforded by the Fifth and Fourteenth Amendments to

the United States Constitution when the same trial judge who held an *ex-parte* hearing

with B.K. and considered a one-sided police report, then presided over John's linked

criminal case. The U.S. Court of Appeals for the Third Circuit has held that, "Findings

must be based upon something more than a one-sided presentation of the evidence." See

*Sims v. Greene*, 161 F.2d 87 (3rd Cir. 1947).

51.    This judge then assigned John a public attorney before the 209A hearing that

made the abuse prevention order permanent and proceeded with the Commonwealth to

arraign him when the attorney was not present in the courtroom.

52.    This judge also purged the trial docket of John's motion to dismiss without

receiving written responses from the Commonwealth, hearing oral arguments, or

providing explanation.

53.    In John's criminal case, an arraignment carries an on-going notation as part of any

background investigation on him.

54.    This notation affects employment offers in and outside of academia, living

arrangements, and a host of other quality of life conditions for John.

55.    Similar to Brandeis, the Commonwealth has effectively labeled him as a criminal,

without the benefit of due process. The adverse mark on John's criminal history is

approaching its three-year anniversary, and the Commonwealth is no closer to trying this

case than it was in November 2016, when John was improperly arraigned.

56.     John found the environment on campus so hostile and toxic that he no longer goes

to campus and the University he had previously loved for its social justice has betrayed

his trust.

57.     For these reasons, John brings this action to obtain equitable and declaratory relief

and legal damages based on causes of action for violations of Title IX of the Education

Amendments of 1972, Title IX retaliation, breach of contract, breach of the covenant of

good faith and fair dealing, estoppel and reliance, defamation, invasion of privacy,

intentional and negligent infliction of emotional distress, and negligence.

## II.     PARTIES

58.     Plaintiff John Doe is a natural person who resides in Illinois. John is currently a

student at Brandeis University, who started his doctorate program in August 2015.

59.     Defendant Brandeis University ("Brandeis" or "the University") is a private,

coeducational research university with a principal address of 415 South Street, Waltham,

Massachusetts 02453. Brandeis was founded in 1948 by the Jewish community as a non-

sectarian institution "open to all . . . with a commitment to making a positive impact on

the world." ("School Mission and Unique Qualities," U.S. News & World Report,

National Rankings. http://colleges.usnews.rankingsandreviews.com/best-

colleges/brandeis-university-2133)(last visited 4/26/2019). Named for Louis Brandeis,

the first Jewish justice of the United States Supreme Court, Brandeis encourages its 3,500

undergraduate students to focus on community service, consistent with the University's

"commitment to Social Justice." (*Id.*)

60.     Brandeis is among the nation's leading universities, ranking 35 in U.S. News &

World Reports 2019 National Universities list. (*Id.*)

61.     At all times material hereto, Brandeis acted by and through its agents, servants, employees, and representatives who were acting in the course and scope of their respective agency or employment and/or in the promotion of Brandeis's business, mission and/or affairs.

62.     Defendant is also Attorney General Maura Healey, who represents the public interest in the name of the Commonwealth of Massachusetts, with a principal address of One Ashburton Place, 18th Floor, Boston, Massachusetts 02108.

63.     In addition to the entities set forth as Defendants herein, there are likely other parties who may well be liable to Plaintiff but respecting who Plaintiff currently lacks specific facts to permit Plaintiff to name such person or persons as a party defendant. By not naming such persons or entities at this time, Plaintiff is not waiving its right to amend this pleading to add such parties, should the facts warrant adding such parties.

## III.     JURISDICTION AND VENUE

64.     For diversity purposes, plaintiff is a citizen of the state of Illinois and defendants are incorporated or have their principle place of business in the Commonwealth of Massachusetts.

65.     This Court has original diversity jurisdiction over this claim pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states.

66.     This Court also has original jurisdiction under Title IX of the Education Act Amendments of 1972, 20 U.S.C. § 1681, *et seq.* and 28 U.S.C. § 1331, and jurisdiction over related state common law and statutory claims under the principles of ancillary and/or pendent jurisdiction pursuant to 28 U.S.C. § 1367.

67.     Additionally, this is an action involving a federal question under 28 U.S.C. § 1331 to redress the deprivation of Plaintiff's constitutional rights under the Fifth and Fourteenth Amendments of the United States Constitution pursuant to 42 U.S.C. § 1983 and his Sixth Amendment right to legal representation.

68.     Venue is proper in the Eastern Division of the District of Massachusetts pursuant to 12 U.S.C. § 1391(b)(2) and District of Massachusetts Local Rule 40.1(D) because a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in the District of Massachusetts and because the Defendants reside in Middlesex County.

## IV.     FACTUAL BACKGROUND

### A. There Was No Dating Relationship Between John and B.K.

69.     John and B.K. met on August 10, 2015, when they began their doctorate program at Brandeis. John was 45 years old. B.K. was approximately 36 years old. At the time, the two exhibited no interest in one another beyond mere classmates.

70.     On March 9, 2016, after attending a social event and consuming alcohol, John and B.K. had sexual intercourse. B.K. marks this date as the beginning of an off-and-on relationship for purposes of her complaint to Brandeis and the Waltham District Court.

71.     Afterwards, the two did not spend time with each other despite B.K.'s birthday in April and their availability over the summer break.

72.     In August 2016, B.K. wanted to take a particular course that was at risk of not being offered and initiated contact with John again to ask if he would register for it. B.K. marks this exchange as the off-and-on relationship with John "on" again.

73.     In exchange, she would assist him with promoting a community event on which he was working. John agreed.

74.    While John had decided to remain cordial with B.K. because of their collegiate relationship, he could detect escalating mood swings from B.K.

75.    B.K. and John were never married to one another, never lived together, and do not parent children together.

76.    Notwithstanding the sexual intercourse that had taken place between B.K. and John, they never believed that they were in a dating relationship of any kind.

### B.    B.K. Falsely Accuses John of Assault and Battery.

77.    After John had spoken with B.K. on October 20, 2016, they continued attending classes together. The two no longer exchanged text messages, emails or conversations in class. Roughly one week later, B.K. reported to Brandeis Police that John had assaulted her.

78.    On October 27, 2016, B.K. appeared before the judge in Waltham District Court and provided sworn testimony that she and John had been in a dating relationship since March 2016, and that on the morning of October 20, 2016, John had assaulted her. She also testified that she had feared for her safety.

79.    The judge issued a temporary abuse prevention order on that day. Brandeis subsequently issued its own no contact order pursuant to the court's ruling. Both orders were delivered to John at his home of residence: the first by Waltham police service and the second by email communication, which was later hand-delivered by Brandeis's Dean of Students, Jamele Adams.

80.    Dean Adams immediately placed John on "emergency suspension," preventing him from attending all classes, performing his responsibility as a teaching assistant, and meeting with Ph.D. faculty necessary for his dissertation work. On information and

belief, at the time Adams took these actions, he had no knowledge of any facts underlying B.K.'s allegations, and had no information suggesting John was a danger to B.K. or the Brandeis community.

81.    On November 17, 2016, almost four weeks after the emergency suspension, the University notified John that B.K.'s accusations related to five alleged violations of Brandeis's R&R Handbook: Sections 3.2 (sexual harassment); 3.5 (non-consensual physical contact); 3.9 (intimidation); 3.10 (threats); 3.11 (physical harm or unwanted contact).

82.    At the same time, the University informed John that John's case would be adjudicated through the University's *informal* Special Examiner's Process, rather than the University's long-established Student Conduct Hearing Process.

## C.  The University Subjects John to the *Informal* Special Examiner's Process in Lieu of the Hearing Process.

### 1.  The Hearing Process

83.    Prior to entering Brandies in 2015, John received from Brandeis a copy of the University's 2015-16 R&R Handbook. As a condition of enrollment, the University required John to agree in writing to be bound by the rules and regulations set forth in the R&R Handbook.

84.    In the 2015-16 R&R Handbook, a student accused of violating a standard of behavior or University policy may be subject to disciplinary action only after the Department of Student Rights and Community Standards makes a "careful evaluation" of the "fact" alleged by the accuser and the "credibility" of the accuser and determines that

there is "sufficient evidence" to refer the matter to the Student Conduct Board for a hearing.

85. The hearing process reflects Brandeis's long-established "philosophy of peer judgment" through student-conducted hearings – students hear and decide the cases before them, with panels consisting of 2 students and 2 faculty members for academic violations, and 3 students and 1 faculty member for all other violations.

86. In the 2015-16 R&R Handbook the Hearing Process applies to all violations referred to it, including allegations involving sexual misconduct.

87. Pursuant to the Hearing Process, the accused must be informed of the details of the charges and receive written charges as many as 32 days before the hearing. In addition, the hearing administrator must be available prior to the hearing at the request of the accused student to provide information regarding the alleged violation.

88. The accused student and the accuser may present evidence and introduce witnesses during the hearing and shall have the right to view and question all evidence and reports presented to the Board during the hearing.

89. The accused student and the accuser shall have the right to question all witnesses appearing before the Board . The accused and accuser may ask questions of each other, and may recall or re-question each other after witnesses have testified. Board members may question both the accused and accuser and all witnesses.

90. At the hearing, the accuser is required to prove his or her allegations by the preponderance of the evidence.

91. A written Hearing Report summarizing the evidence presented at the hearing and

decision rendered by the Board is prepared, and the parties have access to it as an

"education record" pursuant to the federal Family Educational Rights and Privacy Act

("FERPA"), and Section 16.3 of the 2015-16 R&R Handbook.

### 2.   The *Informal* Special Examiner's Process.

92.     In the 2015-16 R&R Handbook, the University unilaterally supplanted the

Hearing Process with the *Informal* Special Examiner's Process for allegations involving

sexual misconduct and sexual harassment.

93.     All other student conduct allegations remain subject to the Hearing Process,

including allegations pertaining to physical harm to others and invasion of personal

privacy.

94.     In the *Informal* Special Examiner's Process, the hearing is entirely eliminated. In

its place, a single individual staffed by the University – the "Special Examiner" –

conducts a closed-door investigation. The Special Examiner separately interviews the

parties and witnesses, and considers documents and other physical evidence. The Special

Examiner chooses which, if any, witnesses to interview, what questions to ask of

everyone involved, and determines what information the accused receives during the

process.

95.     After completing the investigation, the Special Examiner prepares a written report

summarizing disputed and undisputed facts. In the 2015-16 R&R Handbook, the Special

Examiner's Report may offer conclusions or recommendations as to the credibility of

testimony or potential outcomes.

96.     In the 2015-16 R&R Handbook, under which John's case was investigated and

adjudicated, the University expands the Special Examiner's role beyond factual investigator to fact-finder and adjudicator (i.e. judge): the Special Examiner's Report must offer the Examiner's "conclusions" about "the credibility of testimony" and the Examiner's "finding" about "whether the Accused is responsible or not responsible for any or all charges."

97.    The Special Examiner uses the preponderance of the evidence standard in evaluating the responsibility of the accused.

98.    In the 2015-16 R&R Handbook, after the Special Examiner's Report is completed, the parties are not shown a copy of the Report. Instead, the University's "final decision maker" (i.e., the Dean of Students or other designated administrator) prepares a "Summary" of the Special Examiner's "findings" and the parties "listen" to the Summary in separate meetings. The parties have several days to offer new information or witnesses and the final decision maker determines whether to provide the new evidence to the Special Examiner.

99.    With the *informal* adjudication process, or Misconduct Inquiry, an internal University adjudication is based on the disclosure or complaint from a reporter who has decided not to serve as a complainant. No formal charges are levied against the student whose behavior is described.

100.    Neither the accuser nor accused has a right to appeal the final decision maker's unilateral decision to an Appeals Board of three voting faculty members, unlike the traditional student-conducted hearings. The final decision maker retains ultimate discretion whether to reverse, amend or uphold the original final decision.

101.   In the 2015-16 R&R Handbook, University officials are obligated to conduct a preliminary careful evaluation of the facts and to assess the credibility of the accuser before referring a case to the Special Examiner's Process.

### D. **The Special Examiner's Closed-Door Investigation and Judgment of John's Case.**

102.   Immediately after receiving notice of the charges against him on November 17, 2016, John asked University officials to inform him of the factual basis for B.K.'s charges against him. He only knew of the curt affidavit B.K. provided the Waltham District Court for the abuse prevention order to issue. John had no idea what he was alleged to have done wrong that violated the University's standards of conduct outlined in the R&R Handbook.

103.   The University refused his requests.

104.   John then retained private counsel for all aspects of his case given the subsequent criminal complaint that was filed by the Commonwealth. The University rejected John's legal representation and proceeded with the informal Special Examiner's investigation.

105.   The first time John learned any facts underlying B.K.'s Community Standards Report (CSR) was when the Special Examiner interviewed John for the first time on December 7, 2016, at 5:00 a.m., and began to ask him questions about random incidents with B.K. occurring over the past five months. John surmised these incidents had been brought up by B.K. during her interviews with the Special Examiner.

106.   For John's case, the University used an attorney within its Title IX staff to serve as Special Examiner.

107.   The Special Examiner conducted no other interviews with John. It is unclear to

John how many additional interviews the Special Examiner had with B.K. The Special

Examiner also interviewed one of B.K.'s witnesses, the Brandeis Police Detective

assigned the case and a witness identified by John, but refused to interview two

additional witnesses whom John identified that could better assess his character and the

character of B.K.

108.    During this entire process, John received nothing orally or in writing stating what

it was in particular that B.K. accused him of doing. Instead, John had to piece those

accusations together based on the questions the Special Examiner asked him during his

interview.

109.    The questions were random and non-specific. John was forced to try to recollect

events over the course of the semester that were not imprinted in John's memory because

they were unremarkable.

110.    John was not told what B.K.'s witnesses said in their interviews.

111.    After completing the investigation, the Special Examiner passed judgment on

John, concluding he was responsible for all five charges. At no point in the process was

John allowed to confront his accuser or witnesses, or even to know exactly what it is his

accuser or witnesses said against him.

**E.  John Receives a Verbal "Summary" from the University and the Particular
     Accusations Against Him and the Basis for the Special Examiner's
     "Findings" of Responsibility via Rule 14 Motion from the Court.**

112.    On January 10, 2017, Sheryl Sousa, the University's Senior Associate Vice

President for Student Affairs (the administrator chosen to serve as the final decision

maker in John's case, who had no experience or training with respect to the University's

sexual misconduct policies) met with John and read to him the "Summary" she had prepared of the "findings" of the Special Examiner's Report.

113.    John requested but was not given a copy of the Special Examiner's Report at that time or at any time while his case was being adjudicated. After Ms. Sousa had read her summary, John made a formal FERPA request for the Special Examiner's Report and his educational records.

114.    The University never honored John's FERPA request for a copy of the written Summary.

115.    The Special Examiner's Report was subsequently given to John through the Waltham District Court, when John filed a Rule 14 Motion for the evidence the prosecutor intended to present at trial.

116.    The verbal Summary, followed by the written Summary, outlined for John without factual detail what specific conduct he was alleged to have engaged in as the basis for the five violations charged against him.

117.    The accusations of sexual misconduct were incredible to John. Even more disconcerting were the findings of the Special Examiner, that were based on notions of what constitutes sexual misconduct that border on the ridiculous and were arbitrary and capricious.

118.    The Special Examiner analyzed each alleged incident in isolation while misapplying the University's definition of sexual harassment and made her findings collectively. In the absence of any objective, verifiable evidence that any of the alleged incidents occurred, the Special Examiner used manipulative interrogation techniques to

create bogus "inconsistencies" in John's recollection of events and accorded John's

witnesses and documentary evidence no weight in the decision-making process.

119.    First, the Special Examiner acknowledged there were only two witnesses with

direct knowledge of the October 20, 2016, event. The Special Examiner then relied more

on statements made by the friend of B.K. and the Brandeis police detective assigned the

case who "conveniently" overheard John make a whispered incriminating statement to

his attorney in court, and less on John's statements and those of his witnesses.

120.    Second, while the Special Examiner's Report finds that John and B.K. were not in

a dating relationship and provides not even a scintilla of evidence supporting a sexual

misconduct determination, it is framed in such a manner to allow the final decision maker

to draw that very conclusion.

121.    Third, the Special Examiner also made much to do about the time of John's visit

without taking into consideration that the vast majority of Ph.D. students—including

John and B.K.—study, converse and meet with each other at odd times of the day.

122.    Fourth, the Special Examiner's findings were inconsistent with B.K.'s claims.

B.K. never made any statements about being sexually harassed. In fact, her statements,

although spurious, were that John grabbed and shook her arm, chest bumped, and yelled

at her. Yet, the Special Examiner found that sexual misconduct had occurred.

123.    Fifth, the Special Examiner found that B.K. had no motive to fabricate her report,

without acknowledging that B.K. had already fabricated statements within the Report

regarding her account of the August 2016 incident with John.

124.    Sixth, the Special Examiner erroneously found that John had intimidated B.K., yet

the record reflects that she continued to attend classes with John after the alleged incident.

125. The Special Examiner failed to consider the undisputed facts that the two were not in a dating relationship or that B.K.'s statement of facts waivered constantly, and it defies reason for the Special Examiner to have concluded that sexual harassment had occurred. In fact, the Special Examiner never identified any action taken by John that resulted in her finding of sexual harassment.

126. The absurdity of this finding is best summed up by the observation that under the Special Examiner's reasoning that John's "credibility was diminished" by the fact that he did not volunteer to the Examiner that B.K. accused him of being a "racist" or "sexist." On this basis, the Special Examiner found B.K. "more credible" than John on all five violations.

127. The Special Examiner's conclusion was based on nothing more than a manufactured, set-up "inconsistency" elicited through a patently unfair interrogation process. Additionally, the Special Examiner ignored the undisputed fact that B.K. continued to attend classes with John after the date of the alleged incident and before making her report to the University.

128. These findings were patently arbitrary and unfair. The Special Examiner failed to consider the undisputed facts that the two were never in a dating relationship; that B.K. had falsified statements regarding John in the past; and failed to disprove any statement made by John.

129. Additionally, the Special Examiner ignored the information supplied by one of

John's witnesses who worked in the mental health profession for years and stated that John did not exhibit any of the behavior indicators associated with the Report.

130.    The Special Examiner also ignored John's male witness from the cohort who had a more intimate relationship with both parties and had seen B.K. out on dates during the time she alleges she was dating John.

131.    Instead, the Special Examiner relied on two hearsay statements from a close friend of B.K.'s, with an assumed bias, and the University Police Detective assigned to the case. Exclusively on the basis of these unchallenged statements, the Special Examiner concluded that the testimony of John's witnesses and the documentary evidence should be accorded no weight in determining John's guilt or innocence on the sexual harassment charge.

132.    John was stunned by the Special Examiner's findings lodged against him, but not surprised.

133.    He repeatedly told the Title IX staff that all of the University's R&R Handbooks from 2015 through present obligate the University to provide a student with the student's "education records" in compliance with FERPA (Family Educational Rights and Privacy Act). Disciplinary records unquestionably are a part of a student's education record.

134.    Nonetheless, the University refused to provide the Report.

135.    John maintains that the accusations against him are frivolous and not supported by any objective or credible evidence; and that the Special Examiner's findings, as summarized by the University, are arbitrary, capricious, and irrational, and were not supported by a preponderance of the evidence.

### F. **The University's Decision and Sanction.**

136.   On January 10, 2017, Ms. Sousa notified John that, on the basis of her review of the Special Examiner's Report, she found John responsible for all five of the violations for which he had been charged. And because the adjudication was informal, John would have no right to appeal or contest her decision.

137.   Ms. Sousa's decision contained no analysis of the Special Examiner's Report and she refused to refer to any of John's facts, witnesses, or affidavit to the Special Examiner for consideration.

138.   John again asked the University for a copy of the Special Examiner's Report. He also asked for all of the notes of interviews taken by the Special Examiner.

139.   John needed the full Report and underlying interview notes in order to be apprised of all of the facts contained in the Report, including exactly what it is that B.K. said about him, what B.K.'s witnesses said, the weight that the Special Examiner gave to the parties' and witnesses' interview statements, and a full understanding of the factual and legal basis for the Special Examiner's findings. The Summary given to John lacked this information.

140.   While Ms. Sousa acknowledged receipt of John's formal FERPA request for the Report on January 10, 2017, the University failed to comply with it.

141.   Accordingly, John was forced to live with the University's adverse decision against him and wait to receive the information through Waltham District Court with the pending criminal charge.

142.   However, John was sanctioned by the University with a Disciplinary Warning.

143.     A Disciplinary Warning requires the student to receive sensitivity training, but much more importantly, the student's permanent education record will reflect that the student was found responsible for the charges.

144.     In John's case, his education record will permanently state that he was found responsible for sexual misconduct toward another student involving lack of consent and taking sexual advantage of the student's incapacitation, physically harming the student sexually harassing the student, and invading the student's personal privacy.

145.     Brandeis effectively has branded John as a predatory sexual offender on his permanent education record, and the Commonwealth's arraignment has branded him on any background investigation.

146.     John had worked hard at Brandeis to begin a teaching career, and had always volunteered in the community as part of his commitment to public service and political discourse, values central to Brandeis's educational mission.

147.     John will now have to disclose, and defend himself against, his deeply blemished University record and reputation to teaching institution to which he applies, and, will not even be considered for federal government employment.

### G.  **Brandeis Committed Numerous Material Breaches of Its Contractual Obligations to John.**

148.     In the course of the Special Examiner's Process, Brandeis committed numerous material breaches of its contractual obligations to John.

149.     The University's obligations are explicitly set forth in the University's contract with John and are further informed by Massachusetts case law infusing every contract with a "reasonable expectations" requirement and mandating that college and university

disciplinary proceedings cannot be "arbitrary or capricious." Brandeis breached both its express contractual obligations and the obligation imposed by law to be fair as set forth below without limitation.

150.    First, John was contractually entitled to a hearing before the Student Conduct Board. The *informal* Special Examiner's Process should never have been initiated.

151.    As a condition of his matriculation at Brandeis, John agreed in writing to be bound by the rules and regulations in the 2015-16 R&R Handbook.

152.    Nowhere in that Handbook does Brandeis reserve the right to eliminate the Hearing Process for sexual misconduct allegations. The Handbook states that it contains the procedures the University employs when a member of the community believes that a student has violated campus policy. This process is ultimately a Brandeis-grown and nurtured one that is constantly evaluated and tweaked by the community every year.

153.    A student might reasonably expect that Brandeis could "tweak" its disciplinary process. But, "tweaking" cannot reasonably be read to permit the elimination of that process and the introduction of an entirely new process.

154.    Even if Brandeis is contractually permitted to change its disciplinary process, it is not permitted under Massachusetts law to replace it with one that lacks fundamental fairness and that is arbitrary and capricious.

155.    Second, the University never should have adjudicated B.K.'s enervated accusation. In every R&R Handbook issued by the University from 2011-2019, when the University receives a written report of an alleged student conduct violation, the University "shall" make a "careful evaluation of the facts" and the "credibility" of the accuser to determine as a threshold matter whether there is "sufficient evidence of a

violation" to proceed. The University has discretion to not refer the matter to adjudication based on its preliminary evaluation.

156.   In John's case, the University failed to conduct the required "careful evaluation of the facts." Had the University conducted even the most cursory fact evaluation, it would have known that B.K. and John were not in a dating relationship, that B.K. had made false statements in the past, and that she is or was receiving psychiatric professional help—all relevant factors that did not warrant referral to adjudication.

157.   Third, Brandeis refused to provide John with a copy of the Special Examiner's Report, even though the Report is an "education record" to which John is entitled under every version of the R&R Handbook issued by the University from 2011-2019 and under federal law.

158.   John was found responsible for five student conduct violations and was never allowed to read the Report that explained why he was being held responsible. The University forced him to participate in the investigation "blind" and to respond to questions without the benefit afforded B.K.—the proper context. The Summary gave only an overview of the Examiner's findings as interpreted by and filtered through someone other than the Special Examiner.

159.   In January 2019, John received a copy of the Special Examiner's Report only through a Rule 14 Motion in the criminal case, well past the 45 days FERPA allows Brandeis to furnish the Report.

160.   The University still refuses to provide John with the interview notes taken by the Special Examiner, even though they clearly are subject to FERPA.

161.   Fourth, the University never assigned a Co-Examiner (a member of the faculty or

staff) to attend all of the interviews conducted by the Special Examiner and to contribute to the investigation by asking interview questions and advising the Special Examiner in the preparation of the Special Examiner's Report.

162.    Fifth, B.K.'s Report was not submitted in a timely manner, as required by the University. In every version of the R&R Handbook issued by the University from 2011-2014, the University requires that "written reports of violations or complaints shall be submitted to the DSRCS [Department of Student Rights and Community Standards] from the Accuser in a timely manner"; the lack of timeliness is grounds for the University to refuse to refer the matter for adjudication.

163.    While the R&R Handbook does not define a timely submission, B.K. waited approximately a week after she alleges the violations occurred, and, in the interim, continued attending classes with John. It was undisputed that no sexual misconduct occurred for the Title IX intervention to trigger.

164.    Sixth, John was denied his contractual right to a hearing on the charges of non-consensual physical contact, intimidation, threats, and physical harm or unwanted contact. In every version of the R&R Handbook issued by the University from 2015-2019, the University is obligated to adjudicate these alleged violations by the Hearing Process pursuant to a clear and convincing standard.

165.    Seventh, the University violated its own procedures requiring a three-member Panel of University faculty or administrators to review the Special Examiner's findings and recommend to the final decision maker whether to accept or reject the findings. Instead, the University allowed the final decision maker to be the sole reviewer of the

Special Examiner's findings, thereby eliminating a layer of independent oversight that might have reversed the Special Examiner's arbitrary findings.

166.    Eighth, the University subjected John to emergency suspension immediately upon receipt of B.K.'s Report, even though there was not the slightest indication that John was a danger to B.K. or the Brandeis community.

167.    Every version of the R&R Handbook issued by the University from 2015-2019 permits the University to impose an emergency suspension only when the University has reason to believe that the accused presents an imminent danger to the safety or well-being of the University community.

168.    After lifting the emergency suspension, the University continued to breach its contract with John by imposing additional interim sanctions against him; sanctions that breached all of the R&R Handbooks issued by the University during John's time at Brandeis, because they were not remotely related to B.K.'s safety or that of the University community.

169.    Ninth, accepting for the sake of argument that the preponderance of the evidence standard in the 2015-16 R&R Handbook applied to John's case, the University failed to base its findings of responsibility on that standard. Instead, the University's final decision maker rubber-stamped the Special Examiner's findings, which were patently arbitrary, capricious, and irrational, and were not supported by any objective, verifiable, or credible evidence.

170.    Tenth, upon information and belief, Brandeis has violated its contractual obligation and its duties under FERPA to maintain confidentiality about John's education record by allowing persons within the administration to "leak" information about the

Special Examiner's findings to persons outside of the inner-circle of administrators responsible for handling John's case, or by not adequately safeguarding the disciplinary record from being disclosed to their parties. As more fully explained below, any such "leaks" are also defamatory.

171.     Eleventh, the University policies with regards to John's case allows a request for a reasonable delay . . . due to academic or extenuating circumstances. John made such a request on November 17, 2016, so that he could devote time for his studies as finals week was quickly approaching. The University denied the request and met with John at 5:00 a.m. during finals week.

172.     Twelfth, the *informal* Special Examiner's Process conflicts with University policy to an appeal of the outcome as outlined in R&R Handbook Section 18(n), at 39.

### H.  Brandeis Subjected John to a Fundamentally Unfair Disciplinary Process Lacking the Most Basic Elements of Due Process.

173.     In addition to these contractual breaches, the *informal* Special Examiner's Process lacks the most essential elements of due process to safeguard the rights of the accused, and is systemically inequitable. Although the accuser knows his or her story before the investigation even begins, the accused is left in the dark concerning the facts, never knowing what the accuser and witnesses actually have said except as filtered through the Special Examiner. The accused is subjected to a secret investigation process that in John's case was handled by the Special Examiner like a police interrogation of a suspect rather than an independent, impartial investigation.

174.     Instead of proceeding to a hearing at which both sides hear all of the evidence and

have an equal opportunity to present their claims and defenses before an impartial tribunal, the Special Examiner's Process effectively ends with the interrogation, completely short-circuiting due process by allowing the Interrogator to decide issues of credibility and serve as the *de facto* judge.

175.    In John's case, the University compounded the systematic lack of due process by failing to follow its own procedures, allowing the final decision maker to adopt the Special Examiner's findings unilaterally without independent Panel review or appellate review. The final decision maker, who had no training or experience in sexual misconduct disciplinary proceedings, completely deferred to the Special Examiner.

176.    Despite the fact that John recorded the University's and final decision maker's contractual breaches, as well as the fundamental unfairness of the process and irrationality and capriciousness of the Special Examiner's findings, they did nothing to correct this flawed and unfair process and outcome.

177.    Upon information and belief, the University did not refer the accuser to a "care team" for evaluation of "students of concern" in accordance with the revisions to the 2014-15 R&R Handbook in order to make deliberate decisions about appropriate, individualized courses of action .

178.    The University also did not require of the accuser specific dates, times, locations, and alleged conduct in the Report. In John's case, he was asked by the Special Examiner about a very specific visit to the accuser's apartment in "August," without specifying the dates, times, etc.

179.    The University has also breached the confidentiality of the proceedings by sharing their disclosures to those persons with a need to know.

### I.   **Brandeis Has Aided and Abetted B.K.'s Defamatory Conduct and Upon Information and Belief Has Defamed John in its Own Right.**

180.   At the insistence of Brandeis, B.K. went into the Waltham District Court to file an additional, frivolous affidavit and complaint in an attempt to get the University to issue a No Contact Order or to impose onerous restrictions on John's movements, and has defamed John to University officials, students, and the Commonwealth.

181.   Brandeis has known of these false and defamatory actions by B.K., and has aided and abetted them.

182.   Upon information and belief, Brandeis administrators "leaked" information, directly or indirectly, about the Special Examiner's findings to the Commonwealth prosecutors and John's internship employer, or recklessly failed to exercise adequate safeguards to keep the information strictly confidential. As a direct result, John was let go from his internship and is facing criminal prosecution. John has been severely harmed in his prospects for other future permanent employment.

183.   B.K.'s escalating and unchecked campaign to defame and harass John included appearing three times in district court and alleging that a familial relationship between her and John existed and that he has repeatedly assaulted her. None of these claims are credible, and John expects to be totally exonerated by the Massachusetts Appeals Court on those 209A orders.

### J.   **The Commonwealth Subjected John to Fundamentally Unfair Judicial Hearings in Violation of His Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution.**

184.   On October 31, 2016, approximately four days after B.K. went into the Waltham

District Court and made a frivolous 209A claim against John, the Commonwealth filed a criminal complaint in John's case. Upon information and belief, the Commonwealth had not conducted an independent investigation within the four days of filing its criminal charge.

185.    On November 9, 2016, John appeared in Waltham District Court to oppose the Chapter 209A Abuse Prevention Order and to be arraigned on the criminal charge. At the outset of the proceedings, the trial judge assigned the case to the public defender on duty to safeguard John's legal interests. However, after entering an order making the abuse prevention order permanent, the same trial judge proceeded, with the Commonwealth, to arraign John on the criminal charge when the defense counsel left the gallery to manage his other cases.

186.    As such, the Commonwealth violated John's right to legal representation pursuant to the Sixth Amendment to the United States Constitution. Additionally, the same judge who made findings of fact and entered an order against John, violated John's right to due process and fundamental fairness afforded by the Fifth and Fourteenth Amendments to the U.S. Constitution.

187.    On November 15, 2016, John retained private counsel and, on November 17, 2016, informed Brandeis that he was represented by counsel relating all aspects of the investigation. The University disregarded John's assertion of his Fifth Amendment protections and proceeded with its internal investigation. At the end of the investigation, the University communicated or "leaked" its investigation to the Commonwealth for the furtherance of its criminal case. The Commonwealth knew or should have known that

this evidence was illegally obtained and has, twice over, violated John's constitutional protections.

188.    This notation affects employment offers in and outside of academia, living arrangements, and a host of other quality of life conditions for John.

189.    Similar to Brandeis, the Commonwealth has effectively labeled him as a criminal, without the benefit of due process. The adverse mark on John's criminal history is approaching its three-year anniversary, and the Commonwealth is no closer to trying this case than it was in November 2016, when John was improperly arraigned.

190.    In the wake of these gross violations to due process and fundamental fairness, John files his federal complaint, on grounds that Brandeis's and the Commonwealth's outrageous and defamatory conduct has cause irreparable harm to his employment prospects and reputation.

## COUNT I
### (Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* as against Brandeis University)

191.    Plaintiff re-alleges, and adopts by reference the foregoing allegations herein, Paragraphs 1-190 above and further alleges:

192.    Title IX of the Education Act Amendment of 1972, 20 U.S.C. § 1681(a) (1988) ("Title IX"), provides in relevant part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

193.    Title IX is enforceable through an implied right of action affording an individual discriminated against due to his or her gender pecuniary damages and equitable relief.

Brandeis receives federal funding in various forms, including, but not limited to, grants and federal student loans provided to Brandeis by its students or given to Brandeis by the federal government directly.

194.    Brandeis has discriminated against John, on the basis of his race and sex, through its discriminatory, inequitable implementation of Brandeis's Special Examiner's Process against John, which subjected him to different rules of sexual behavior than his accuser. The Department of Education, Office of Civil Rights ("OCR"), has made clear that Title IX applies to University sexual misconduct proceedings involving interracial couples.

195.    John filed a complaint with the OCR about the University's Title IX violations in his case, and on February 16, 2017], the OCR accepted John's complaint for investigation. Upon information and belief, this is only the third case that the OCR has investigated on behalf of an accused student.

196.    The OCR has made clear that it "handles cases of sex discrimination involving a range of issues, such as discriminatory discipline, harassment and sexual violence, and unequal access to educational resources." (Questions and Answer on Title IX and Sexual Violence (May 1, 2019), available at

https://www2.ed.gov/about/offices/list/ocr/frontpage/faq/sex.html#sexdisc5).

197.    In such proceedings, the University must provide a fair and equitable process for both the complainant and the accused, and must "accord[] due process to both parties involved." (Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties," at 22 (Jan. 2001)(emphasis added), available at http://www2ed.gov/about/offices/list/ocr/docs/shguide.pdf).

198.    A university violates Title IX regulations when it "subject[s] students to separate

or different rules or behavior, sanctions, or other treatment . . . ." (*Id.* at 4).

199.    Throughout the Special Examiner's Process, the University treated John

differently in terms of accommodation of meeting times and dates, and the weight given

to statements, evidence and witnesses.

200.    The two were never in a dating relationship, and conflicting eyewitness accounts

do not meet the preponderance of the evidence burden set by the University.

Accordingly, Brandeis had not basis for finding that John was responsible for sexual

misconduct.

201.    Brandeis further violated Title IX by failing to accord John the opportunity to

present a defense at a hearing before an impartial tribunal – as set forth above. Instead,

John was subjected to a secret interrogation process, in which he never even heard his

accuser or witnesses, much less questioned them.

202.    Brandeis's *informal* Special Examiner's Process is fundamentally at odds with

OCR's Title IX guidelines, including those in the Dear Colleague Letter, which notes that

"schools generally conduct investigations and hearings to determine whether sexual

harassment or violence occurred. (Dear Colleague Letter (Apr. 4, 2011), at 10, available

at http://www2ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf)(emphasis

added).

203.    The Dear Colleague Letter provides that, "[t]hroughout a school's Title IX

investigation, including at any hearing, the parties must have an equal opportunity to

present relevant witnesses and other evidence. The complainant and the alleged

perpetrator must be afforded similar and timely access to any information that will be

used at the hearing." (*Id.* at 11).

204.   Brandeis further violated John's rights under Title IX by holding meetings with B.K. privately, including at least one meeting where B.K. was accompanied by her friend, but Brandeis did not acknowledge John's legal counsel and never permitted him to be involved in any aspect of the process.

205.   Although the Dear Colleague Letter counsels colleges to use the preponderance of the evidence standard in sexual misconduct disciplinary proceedings, in John's case, even this lowest standard of proof was not followed by the Special Examiner, and the University took no corrective action. Given the lack of due process safeguards, Brandeis should have used the "clear and convincing" standard of proof to mitigate at least to some extent the lack of due process.

206.   The outcome of the Special Examiner's Process against John was clearly erroneous, arbitrary and capricious; the University was on notice of, and was deliberately indifferent to, the serious procedural irregularities and lack of due process that infused the proceedings; the University selectively enforced its standards of sexual behavior to John's detriment; and the University's conduct was so severe, pervasive, and objectively offensive that it denied John equal access to education that Title IX is designed to protect. John was discriminated against by Brandeis in violation of Title IX and, as a result, John has been seriously and irreparably damaged.

207.   As a direct, proximate, and foreseeable consequence of Brandeis's aforementioned conduct, John's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to physical well-being emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and

professional opportunities, loss of future career prospects, and other direct and consequential damages.

208.     As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

**COUNT II**
**(Title IX Retaliation as against Brandeis University)**

209.     Plaintiff re-alleges, and adopts by reference the foregoing allegations herein, Paragraphs 1-208 above and further alleges:

210.     On February 6, 2017, John filed another complaint with MCAD against Brandeis for the same discrimination. The MCAD declined the offer to investigate this matter.

211.     On February 16, 2017, John filed a Title IX complaint with OCR alleging that Brandeis discriminated against him based on his race and gender. The complaint was accepted by OCR on July 24, 2017.

212.     After John filed his Title IX complaints against Brandeis, the University took additional adverse action that caused him further harm.

213.     On November 29, 2017, Dean Adams barred John via email from his place of business within the university.

214.     On March 13, 2019, Dean Adams sent another email to John banning him from the University with threats of suspension if the warning is not heeded.

215.     On information and belief, the University then contacted to local district attorney's office and encouraged it to refer the matter for criminal prosecution and provided the disciplinary records it had compiled on John.

216.     As a direct, proximate, and foreseeable consequence of the Commonwealth's and

Brandeis's numerous material breaches, John's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and psychological opportunities, loss of future career prospects, and other direct and consequential damages.

217.    As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

### COUNT III
**(Civil Conspiracy as against the Commonwealth of Massachusetts and Brandeis University)**

218.    Plaintiff re-alleges, and adopts by reference the foregoing allegations herein, Paragraphs 1-217 above and further alleges:

219.    Defendants conspired with one another, as well as other individuals and entities, to perpetrate an unlawful act upon John or to perpetrate a lawful act by unlawful means, *to wit*: Defendants conspired to have the Commonwealth fraudulently obtain John private records held by the University, including but not limited to the informal Special Examiner's Report and documentation received from John, which were private and confidential.

220.    The participants in the conspiracy, including Defendants, knew or should have known that John was represented by legal counsel in this matter.

221.    Upon information and belief, Defendants – by and through their employees – had

actual or constructive knowledge of the attorney representation; and devised a scheme to

circumvent that representation and use the documents from the University's informal

process in the Commonwealth's criminal case.

222.    As a direct, proximate, and foreseeable consequence of the Commonwealth's and

Brandeis's numerous material breaches, John's academic and career prospects, earning

potential, and reputation have been severely harmed. He has sustained significant

damages, including but not limited to damages to physical well-being, emotional and

psychological damages, damages to reputation, past and future economic losses, loss of

educational and psychological opportunities, loss of future career prospects, and other

direct and consequential damages.

223.    As a result of the foregoing, John is entitled to recover damages in an amount to

be determined at trial, plus prejudgment interest and attorneys' fees and costs.

### COUNT IV
**(Violations to the Sixth Amendment to the United States Constitution as against the
Commonwealth of Massachusetts and Brandeis University)**

224.    Plaintiff re-alleges, and adopts by reference the foregoing allegations herein,

Paragraphs 1-223 above and further alleges:

225.    On November 9, 2016, the Commonwealth filed a charge of Assault and Battery

on a Family or Household Member against John pursuant to c.265 §13M(a).

226.    Upon information and belief, the four days it took the Commonwealth to file this

criminal charge is insufficient time to conduct a proper investigation.

227.    On November 15, 2016, John had retained private counsel to safeguard his legal

interests in all aspects of this case.

228.    On November 17, 206, John communicated to Brandeis that he had retained legal

counsel. The University disregarded John's assertions and proceeded with its informal Special Examiner's Process.

229.    Brandeis then communicated the findings of its investigation to the Commonwealth in order to aid the Commonwealth in its criminal investigation of John.

230.    These actions represent a gross violation of John's Sixth Amendment right to legal representation.

231.    As a direct, proximate, and foreseeable consequence of the Commonwealth's and Brandeis's numerous material breaches, John's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and psychological opportunities, loss of future career prospects, and other direct and consequential damages.

232.    As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT V
### (Breach of Contract as against Brandeis University)

233.    Plaintiff re-alleges, and adopts by reference the foregoing allegations herein, Paragraphs 1-232 above and further alleges:

234.    At all times hereto, a contractual relationship exists between Brandeis and John through Brandeis's 2015-16 R&R Handbook, or alternatively, through subsequent R&R Handbooks.

235.    Brandeis is required to act in accordance with the R&R Handbooks in

adjudicating reports of alleged violations of student conduct standards.

236.    For all the reasons set forth above, Brandeis has materially breached its contracts with John by failing to comply with its obligations, standards, policies, and procedures set forth in the R&R Handbooks in the course of the Special Examiner's Process against John, and by subjecting him to a blatantly arbitrary and capricious disciplinary proceeding.

237.    As a direct, proximate, and foreseeable consequence of Brandeis's numerous material breaches, John's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and psychological opportunities, loss of future career prospects, and other direct and consequential damages.

238.    As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

### COUNT VI
### (Breach of the Covenant of Good Faith and Fair Dealing as against Brandeis University)

239.    Plaintiff re-alleges, and adopts by reference the foregoing allegations herein, Paragraphs 1-238 above and further alleges:

240.    Based on the foregoing facts, Brandeis breached and violated the covenant of good faith and fair dealing implied in its contracts with John by, *inter alia*, failing to provide John with a hearing before an impartial tribunal, and instead, subjecting him to an inquisitorial, secret and arbitrary and capricious informal Special Examiner's Process.

241.     As a direct, proximate, and foreseeable consequence of these breaches, John's

academic and career prospects, earning potential, and reputation have been severely

harmed. He has sustained significant damages, including but not limited to, damages to

physical well-being, emotional and psychological damages, damages to reputation, past

and future economic losses, loss of educational and professional opportunities, loss of

future career prospects, and other direct and consequential damages.

242.     As a result of the foregoing, John is entitled to recover damages in an amount to

be determined at trial, plus prejudgment interest and attorneys' fees and costs.

### COUNT VII
**(Violations to the Fourth and Fifteenth Amendments to the United States Constitution
as against the Commonwealth of Massachusetts)**

243.     Plaintiff re-alleges, and adopts by reference the foregoing allegations herein,

Paragraphs 1-242 above and further alleges:

244.     On or about October 27, 2016, the trial judge at the Waltham District Court held

an *ex-parte* hearing with B.K. to entertain her claim for a c.209A abuse prevention order

against John. The judge made findings of fact and entered an order in her favor, finding

that she and John were family or household members, that John had assaulted her and

that she was in fear for her safety.

245.     On November 9, 2016, the same judge conducted a hearing with B.K. and John to

decide whether to make permanent the temporary order he had just issued fourteen days

prior. After hearing B.K.'s testimony, he again issued the order in her favor.

246.     On this same date, the same judge proceeded to preside over the linked criminal

case against John. He had assigned the public defender on duty to safeguard John's legal rights but proceeded, with the Commonwealth, to arraign John when the attorney was not present in the courtroom.

247.    The Commonwealth acted in violation of John's Fourth and Fifteenth Amendment rights to due process and fundamental fairness.

248.    As a direct, proximate, and foreseeable consequence of the Commonwealth's numerous material breaches, John's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and psychological opportunities, loss of future career prospects, and other direct and consequential damages.

249.    As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT VIII
### (Estoppel and Reliance as against the Commonwealth of Massachusetts and Brandeis University)

250.    Plaintiff re-alleges, and adopts by reference the foregoing allegations herein, Paragraphs 1-249 above and further alleges:

251.    Brandeis's various standards, policies and procedures constitute representations and promises that Brandeis expected or should have reasonably expected would induce action or forbearance by John.

252.    Likewise, the U.S. Constitution affords John, as a defendant in a criminal case,

even higher standards and expectations that the Commonwealth should have reasonably been expected to follow.

253. Brandeis expected or should have expected John to accept the University's offer of admission, incur tuition and fee expenses, and choose not to attend other colleges based on its express and implied promises, including that Brandeis would provide John with a fundamentally fair process in a hearing before his peers, should he be accused of a violation of the R&R Handbook.

254. As for the Commonwealth, citizens are expected, or should be able to expect, a fundamentally fair criminal process in a court of law.

255. John relied to his detriment on Brandeis's express and implied promises and representations as well as the Commonwealth's obligation to administer justice fairly and without bias. Instead, the defendants have chosen to use their offices, not promote their respective policies and procedures, but to defame, humiliate and inconvenience John.

256. As a direct, proximate, and foreseeable consequence of the above-identified conduct, John's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

257. As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

**COUNT IX**
**(Negligence as against the Commonwealth of Massachusetts and**
**Brandeis University)**

258.    Plaintiff re-alleges, and adopts by reference the foregoing allegations herein,

Paragraphs 1-257 above and further alleges:

259.    Brandeis owes duties of care to John. Such duties include, without limitation, a

duty of reasonable care in investigating and adjudicating the charges against him.

Brandeis breached its duties of care owed to John.

248.    Likewise, the Commonwealth owes a similar duty of care to John. Given that a

criminal arraignment on John's background investigation is a tremendous impediment to

employment, housing and other quality of life factors, the Commonwealth owes a duty of

care in investigating a criminal charge against him. For a case it took four days to

consider filing, three years is too long to still await a criminal trial.

249.    As a direct, proximate, and foreseeable consequence of the above-identified

conduct, John's academic and career prospects, earning potential, and reputation have

been severely harmed. He has sustained significant damages, including but not limited to,

damages to physical well-being, emotional and psychological damages, damages to

reputation, past and future economic losses, loss of educational and professional

opportunities, loss of future career prospects, and other direct and consequential damages.

250.    As a result of the foregoing, John is entitled to recover damages in an amount to

be determined at trial, plus prejudgment interest and attorneys' fees and costs.

**COUNT X**
**(Defamation as against the Commonwealth of Massachusetts and**
**Brandeis University)**

251.    Plaintiff re-alleges, and adopts by reference the foregoing allegations herein,

Paragraphs 1-250 above and further alleges:

252.    Brandeis has aided and abetted B.K. in defaming John, allowing B.K. to publish statements concerning John to third parties, both orally and in writing, which Brandeis knows are false and malicious.

253.    The Commonwealth has also defamed John by misusing its authority to file a criminal arraignment that has "blacklisted" him from employment.

254.    Upon information and belief, Brandeis has independently defamed John by deliberately, recklessly, or negligently leaking information about the Special Examiner's findings to third parties outside of the University's inner circle of administrators with a need to know John's disciplinary history.

255.    Upon information and belief, University administrators knew that the Special Examiner's findings could not be squared with the evidence, defied common sense, and were arbitrary and capricious, and know that B.K.'s initial Report, and subsequent Reports and public rants in court against John, were unreliable. Nevertheless, the University permitted the Special Examiner's findings to be leaked to third parties.

256.    Brandeis's conduct in defaming John and in aiding and abetting B.K.'s defamatory conduct was done with negligent, reckless, and/or intentional disregard as to their falsity. Brandeis's conduct has harmed John's reputation in the community, leading directly to the loss of employment, loss of University positions, loss of prospective employment opportunities, and loss of educational and professional opportunities and prospects.

257.    As a direct, proximate, and foreseeable consequence of the above-identified

conduct, John's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

258.    As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT XI
### (Invasion of Privacy as against Brandeis University)

259.    Plaintiff re-alleges, and adopts by reference the foregoing allegations herein, Paragraphs 1-258 above and further alleges:

260.    Upon information and belief, Brandeis has unreasonably, substantially, and seriously interfered with John's privacy by disclosing facts of a highly personal and intimate nature, including the findings of the Special Examiner, to the Commonwealth of Massachusetts for criminal prosecution, as well as faculty outside of its inner circle, and John's past, present and prospective employers. Brandeis has disclosed these facts in bad faith and without any legitimate reason for doing so.

261.    As a direct, proximate, and foreseeable consequence of the above-identified conduct, John's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

262.    As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT XII
### (Intentional Infliction of Emotional Distress as against the Commonwealth of Massachusetts and Brandeis University)

263.    Plaintiff re-alleges, and adopts by reference the foregoing allegations herein, Paragraphs 1-262 above and further alleges:

264.    The actions of the Commonwealth and Brandeis were willful and intentional.

265.    The Commonwealth and Brandeis knew or should have known that their actions in erroneously entering a criminal arraignment on John's background history, or finding him responsible for B.K.'s patently frivolous charges, in conducting a fundamentally flawed disciplinary process, and in sanctioning John by effectively labeling him as a criminal and predatory sexual offender would cause John severe emotional distress.

266.    The Commonwealth's and Brandeis's conduct was extreme and outrageous, beyond the bounds of decency, and utterly intolerable in a civilized community.

267.    The Commonwealth's and Brandeis's conduct was the direct and proximate cause of John's severe emotional distress. He is deeply depressed and anxious; he has lost weight; he is no longer able to sleep through the night; and he has had serious suicidal ideation.

268.    As a direct, proximate, and foreseeable consequence of the Commonwealth's and Brandeis's aforementioned conduct, John's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, severe emotional distress, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future

economic losses, loss of educational and professional opportunities, loss of future career

prospects, and other direct and consequential damages.

269.    As a result of the foregoing, John is entitled to recover damages in an amount to

be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT XIII
### (Negligent Infliction of Emotional Distress as against the Commonwealth of Massachusetts and Brandeis University)

270.    Plaintiff re-alleges, and adopts by reference the foregoing allegations herein,

Paragraphs 1-269 above and further alleges:

271.    When the Commonwealth and Brandeis undertake to investigate [criminal]

allegations of sexual and other misconduct against one of its students, they owe that

student a duty to protect him from foreseeable harm.

272.    By participating in the informal Special Examiner's Process, under protest, John

reasonably relied upon Brandeis's duty to protect him from harm; and by participating in

the court proceedings, with legal counsel assigned, John reasonably relied upon the

Commonwealth's duty to protect him from harm.

273.    For all the reasons set forth above, the Commonwealth and Brandeis breached

their duties of reasonable care.

274.    As a result, John has suffered physical harm, including severe emotional distress.

He is deeply depressed and anxious; he has lost weight; he is no longer able to sleep

through the night; and he has serious suicidal ideation.

275.    A reasonable person would have suffered severe emotional distress under the

same or similar circumstances

276.    As a result of the foregoing, John is entitled to recover damages in an amount to

be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT XIV
### (Declaratory Judgment as against the Commonwealth of Massachusetts and Brandeis University)

277. Plaintiff re-alleges, and adopts by reference the foregoing allegations herein, Paragraphs 1-276 above and further alleges:

278. The Commonwealth and Brandeis have committed numerous violations of its contractual obligations and of federal and state law.

279. John's educational and career opportunities have been severely damaged. Without appropriate redress, the unfair outcome to the Commonwealth's criminal proceedings and Brandeis's deeply flawed process will continue to label John as a criminal and predatory sexual offender greatly jeopardizing his prospects for completing his dissertation and future employment, with no end in sight.

280. As a result of the foregoing, there exists a justiciable controversy between the parties with respect to the outcome, permanency, and future handling of John's criminal record in the Commonwealth and his education record at Brandeis.

281. By reason of the foregoing, pursuant to 28 U.S.C. § 2201, John requests a declaration that: (a) the findings and sanction against John made by Brandeis pursuant to the informal Special Examiner's Process be reversed; (b) John's disciplinary record pursuant to the Special Examiner's Process be expunged and removed from his education record at Brandeis; (c) Brandeis shall provide John with a notarized letter confirming that the findings and sanction have been reversed and expunged from John's education record; (d) Brandeis shall restore John's reputation to third parties to whom the University has leaked and/or failed to adequately safeguard the findings of the Special

Examiner's Process; (e) the criminal complaint against John made by Commonwealth that violated his Fourth, Sixth and Fifteenth Amendments to the U.S. Constitution be reversed and the arraignment expunged from his criminal background history, and; (f) the Commonwealth shall provide to John satisfactory evidence of the same.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff John Doe, respectfully requests that this Honorable Court:

a)  Order Brandeis to reverse and expunge its findings of responsibility and sanction from John's education record, and to publicly state that Brandeis has reversed and expunged the findings and sanction;

b)  Order Brandeis to verify this reversal and expungement of John's education record by providing John with a notarized letter confirming that the findings and sanction have been reversed and expunged from John's education record;

c)  Order the Commonwealth of Massachusetts to dismiss its criminal case against Plaintiff John Doe for due process violations and remove the arraignment entered into his criminal background files;

d)  Award John compensatory damages in excess of Seventy-Five Thousand, One Dollars ($75,001.00), including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages;

e)  Award prejudgment interest;

f)  Award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b)(relating to Title IX), or pursuant to other statute or common law doctrine providing for such award;

g)  For a punitive award against all Defendants (to discourage future conduct); and

h)  For such additional relief as the Court may deem just and proper.

## PLAINTIFF'S DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action of all issues so triable.

## RESERVATION OF RIGHTS

Plaintiff reserves its right to further amend this Complaint, upon completion of its investigation and discovery, to assert any additional claims for relief against Defendants or other parties as may be warranted under the circumstances and as allowed by law.

Respectfully submitted,

John Doe, *pro se*

Dated: May 6, 2019