UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PAUL DISMUKES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil No. 19-11049-LTS |
| | ) |
| BRANDEIS UNIVERSITY, | ) |
| | ) |
| Defendant. | ) |
| | ) |

ORDER ON MOTION FOR SUMMARY JUDGMENT
(DOC. NO. 68) AND OTHER PENDING MOTIONS (DOC. NOS. 74, 80)

April 16, 2021

SOROKIN, J.

In October 2016, a female Ph.D. student ("EO")[1] at Brandeis University alleged that Paul Dismukes, a male Ph.D. student at Brandeis, had harassed and physically assaulted her on her front porch when she left her home in Waltham, Massachusetts, early one morning.  Her allegations resulted in a civil restraining order against Dismukes that was subsequently extended four times over several years by the Waltham District Court; criminal charges against Dismukes prosecuted by the Middlesex County District Attorney's Office; and an informal Title IX investigation by Brandeis culminating in protective measures limiting Dismukes's activities on campus but no formal discipline or other notation in his academic record.  Proceeding pro se, Dismukes has sued Brandeis, advancing numerous causes of action.  Pending now are Brandeis's motion for summary judgment and related motions by Dismukes.

---

[1] The Court refers to the student using her initials.  Brandeis does the same in its papers and has redacted her name from its exhibits.  Dismukes likewise omitted her name from his Complaint, using instead a set of pseudonymous initials.

I.      THE RECORD

The Court first addresses the record of undisputed facts before it in connection with the summary judgment motion.  This requires a brief recitation of salient events from the procedural history in this case and resolution of a request by Dismukes to defer ruling on Brandeis's motion.

In September 2019, the Court set a schedule to govern discovery and pretrial motion practice in this action.  Doc. No. 39.[2]  Dismukes disregarded his obligations under that Order, failing to make initial disclosures, serve discovery, or respond to Brandeis's discovery requests by the relevant deadlines.  In a May 2020 Order allowing Brandeis's motion to compel Dismukes to provide disclosures and discovery responses, the Court observed that Dismukes had demonstrated "a decision to ignore his case for a substantial period of time and disregard the governing scheduling order of which he was well aware."  Doc. No. 53 at 2.  Shortly thereafter— and long after the deadline for written discovery requests had passed without Dismukes serving any requests—the Court provided additional time for Dismukes to engage in discovery (including the taking of depositions) to support his claims.  Doc. No. 62.

Consistent with the extended deadlines, Brandeis moved for summary judgment on November 16, 2020, Doc. No. 68, and Dismukes opposed the motion, Doc. No. 74.[3]  In support of its motion, Brandeis filed a statement of undisputed facts, as required by the Local Rules. Doc. No. 69; see D. Mass. L.R. 56.1.  Although Dismukes opposed the motion with his own memorandum and exhibits, Doc. Nos. 74, 75, he filed no response to Brandeis's statement of

---

[2] Citations to items appearing on the Court's electronic docket ("Doc. No. ___ at ___") reference the document and page numbers assigned by CM/ECF.

[3] Dismukes, who was granted leave to make submissions electronically, Doc. No. 28, styled his opposition as a "motion" asking the Court to deny the summary judgment motion, Doc. No. 74. The Clerk shall TERMINATE Dismukes's "motion" (Doc. No. 74), which is appropriately viewed as an opposition brief and not a cross-motion or other request for separate relief.

facts, nor did his overlength brief contain "a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation," D. Mass. L.R. 56.1.  After briefing on the motion was completed with the filing of Brandeis's reply, Doc. No. 76, the Court ordered the parties to "file a unified statement of material undisputed facts" containing Brandeis's asserted facts and accompanying record citations, with each fact followed by Dismukes's response.  Doc. No. 78.  Such a submission is consistent with the Standing Order Regarding Briefing of Summary Judgment Motions for Judge Leo T. Sorokin's Session,[4] which sets forth this session's practice of ensuring compliance with Local Rule 56.1 by requiring the parties to file one combined document pairing each of the moving party's asserted facts with the opposing party's response.  It also afforded Dismukes a second opportunity to respond to Brandeis's statement of facts.  Dismukes, however, declined to participate in this process.  Doc. No. 81-1.

Instead, without conferral (another violation of the Local Rules, see D. Mass. L.R. 7.1(a)(2)), Dismukes filed a motion asking the Court to deny or defer ruling on Brandeis's motion for summary judgment, invoking Federal Rule of Civil Procedure 56(d).  Doc. No. 80.  According to Dismukes, he was unable to "present essential facts to justify his opposition" to summary judgment because Brandeis's discovery responses were inadequate, and because Brandeis's deposition of him featured "compound and leading questions that were not a search for the truth."  Doc. No. 80-1.  Thereafter, Brandeis re-filed its statement of facts, this time

---

[4] This Standing Order is available on the Court's website, and the relevant requirement is in paragraph 3:
http://www.mad.uscourts.gov/boston/pdf/sorokin/LTS_Standing%20Order%20re%20Summary%20Judgment%20Rev.pdf (last visited Apr. 15, 2021).

noting after each fact that Dismukes had "declined to respond."  Doc. No. 81 at 3-28.  It also opposed Dismukes's motion pursuant to Rule 56(d).  Doc. No. 82.

Local Rule 56.1 provides: "Material facts of record set forth in the statement required to be served by the moving party <u>will be deemed for purposes of the motion to be admitted</u> by opposing parties <u>unless controverted by the statement required to be served by opposing parties</u>." D. Mass. L.R. 56.1;[5] <u>see</u> Fed. R. Civ. P. 56(e)(2) (permitting a court to "consider [a] fact undisputed for purposes of" summary judgment if a party "fails to properly address another party's assertion of fact").  Brandeis cited this rule in its reply brief and asked the Court to impose the consequence described therein due to Dismukes's failure to comply with the rule. Doc. No. 76 at 1 n.1.  It reiterated this request after Dismukes's refusal to comply with the Court's order requiring a combined statement of facts.  Doc. No. 81 at 2.

After careful consideration, the Court ALLOWS Brandeis's request and deems each of the assertions of fact contained within Brandeis's statement of facts (Doc. No. 81) ADMITTED for purposes of the pending summary judgment motion.  Though Dismukes is not a lawyer, he is a well-educated pro se litigant.  <u>See</u> Doc. No. 56 at 2.  He, like other pro se litigants, is bound to comply with all applicable Federal and Local Rules.  <u>Fed. Deposit Ins. Corp. v. Anchor Props.</u>, 13 F.3d 27, 31 (1st Cir. 1994).  His failure to answer Brandeis's factual statement was not an accidental oversight or omission by a litigant unaware of the relevant requirements.  Rather, he refused to respond even after Brandeis cited the Local Rule requiring a response and specifying the consequences for not providing one, after the Court provided him a second chance to comply with that requirement and its own Standing Order, and after Brandeis endeavored to coordinate a

---

[5] All internal quotation marks have been omitted, and all emphases supplied, unless otherwise noted.

combined submission with him in communications reiterating the terms of the Court's order.  In these circumstances, treating Brandeis's statement of facts as conceded by Dismukes is warranted.  Fed. R. Civ. P. 56(e)(1)-(2); D. Mass. L.R. 1.3, 56.1.

Federal Rule of Civil Procedure 56(d) does not shelter Dismukes from this consequence.  Rule 56(d) provides: "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."  Dismukes's attempt to avoid summary judgment via Rule 56(d) fails for several reasons.  First, his motion is not accompanied by any "affidavit or declaration," as the rule requires.  See Gordon v. Starwood Hotels & Resorts Worldwide, Inc., 238 F. Supp. 3d 229, 239 (D. Mass. 2017) (explaining unsworn brief is not "penalty of perjury statement" necessary to support a Rule 56(d) request).

Second, the record amply demonstrates that Dismukes has neither acted diligently nor supported his request with a showing of good cause for his failure to "marshal[] the necessary facts earlier in the proceedings."  Rivera-Torres v. Rey-Hernandez, 502 F.3d 7, 10 (1st Cir. 2007).  He missed deadlines without explanation and then required Court orders before making necessary disclosures and responding to Brandeis's discovery requests.  He conducted no discovery of his own during the time originally provided by the Court.  He filed no motion to compel or otherwise challenge Brandeis's responses to the discovery requests he finally served after the Court provided him additional time, despite the Court having set a deadline for raising such issues.  Doc. No. 62.  He conducted no depositions of any witnesses he believed had evidence to support his claims.  The Rule 56(d) motion neither acknowledges nor endeavors to establish good cause excusing the lack of diligence that has characterized Dismukes's approach

to this case from its inception.  Put simply, Dismukes had a full and fair opportunity to engage in discovery and collect evidence supporting his claims.  He elected not to do so at his own peril. See Rivera-Torres, 502 F.3d at 10 (emphasizing Rule 56(d) "is not designed to give relief to those who sleep upon their rights").

Third, Dismukes has not identified specific facts he would develop if given additional time to conduct discovery, let alone articulated a plausible basis for finding such facts exist, can be retrieved in a reasonable time, and would defeat Brandeis's summary judgment motion.  Id. His conclusory and untimely challenges to Brandeis's discovery responses and its examination of him during his own deposition do not satisfy the burden borne by a litigant seeking to avail himself of "the prophylaxis" of Rule 56(d).  Id.

Accordingly, Dismukes's motion to deny or defer ruling on Brandeis's summary judgment motion (Doc. No. 80) is DENIED.

## II.   THE MERITS

Turning to the substance of Brandeis's motion, the Court applies the familiar summary judgment standard to the undisputed material facts identified by Brandeis and unrebutted by Dismukes.  See Fed. R. Civ. P. 56(a); Quinones v. Houser Buick, 436 F.3d 284, 289 (1st Cir. 2006) (discussing standard and noting burden on non-moving party to set forth specific facts showing that a genuine issue of material fact exists).  In reviewing this record, the Court examines the facts in the light most favorable to Dismukes, the non-moving party, and draws all reasonable inferences in his favor.  Sands v. Ridefilm Corp., 212 F.3d 657, 661 (1st Cir. 2000). Brandeis seeks summary judgment on all thirteen claims alleged in Dismukes's complaint.[6]  The

---

[6] Though the Complaint contained a fourteenth claim, it was asserted only against defendants who were dismissed earlier in the action.  See Doc. No. 1 at 45-46; Doc. No. 7 at 2-3.  The

Court will address Dismukes's two Title IX claims first, his three contract-based claims next, and then the various claims that fall in neither of those categories.  None of the claims survive Brandeis's motion.[7]

A.      Title IX (Counts I and II)

Dismukes first alleges Brandeis violated Title IX by discriminating against him based on his gender during its informal investigation of EO's accusations.  Doc. No. 1 at 36-40.  This claim fails on either of the two theories available to Dismukes.[8]  As this Court has explained elsewhere, both theories—selective enforcement and erroneous outcome—require a showing of gender bias.  See Doe v. Stonehill Coll., Inc., No. 20-cv-10468-LTS, 2021 WL 706228, at *6-7 (D. Mass. Feb. 23, 2021) (noting both types of Title IX claims require evidence that the decision to investigate and/or the outcome were motivated by plaintiff's gender).  The undisputed facts here include concessions by Dismukes that he can point to no evidence that any person involved in Brandeis's informal Title IX investigation was biased against him because of his gender.  Doc. No. 81 at 23-24.  Dismukes admittedly has no evidence that any aspect of the investigation he challenges, including any of the findings expressed in the internal report issued as a result of the investigation, were undertaken or reached due to his gender.  Id. at 24.  Indeed, nothing in the

---

Complaint remains the operative pleading, as Dismukes's requests to amend it were denied. Doc. Nos. 16, 46.

[7] This is so even considering the documents Dismukes has submitted with his motions and memoranda.  The Court has reviewed all of his exhibits, many of which duplicate items also appearing among Brandeis's exhibits (including, it is worth noting, Dismukes's own deposition, of which Dismukes offers exactly the same excerpts submitted by Brandeis).  See Doc. Nos. 71-1, 80-5.  None create a genuine factual dispute that would salvage any of Dismukes's claims.

[8] In his brief, Dismukes recharacterizes his federal claims as arising under Title VII.  Doc. No. 75 at 35-39.  Of course, the Complaint contains no Title VII claims, Dismukes may not unilaterally amend his claims via a memorandum at this stage in the litigation, and Title VII has no application to allegations of discrimination outside the context of an employer-employee relationship.  The Court will address the claims pursuant to Title IX, as Dismukes originally brought them and as Brandeis appropriately argues them.

record suggests "anything other than that [Brandeis] responds to the complaints it receives, regardless of the genders of the parties involved."  Stonehill Coll., 2021 WL 706228, at *6.

Rather, Dismukes's entire assertion of gender bias arises from the fact that he is a man, his accuser is a woman, and the individuals who conducted the informal investigation were women.  Without more—and there is no more here—Dismukes's Title IX claims cannot withstand Brandeis's challenges.  Even if Dismukes had even a shred of evidence supporting an inference of gender bias, his claim of selective enforcement still would fail because he has identified no similarly situated comparator of another gender who was treated differently.  See Haidak v. Univ. of Mass.-Amherst, 933 F.3d 56, 74 (1st Cir. 2019) (rejecting assertion that plaintiff and his accuser, whom plaintiff subsequently alleged also had engaged in misconduct but against whom the university did not initiate charges, were similarly situated).  Likewise, his erroneous outcome claim would founder even if there were evidence of gender bias, as it depends on Dismukes's argument that his own account of the relevant events, which differs from the rendition provided by EO and credited by Brandeis, should have exonerated him.  This argument is eviscerated by the undisputed fact that the very same incident at issue in Brandeis's investigation also was the subject of a series of proceedings in the Waltham District Court.  In that forum, multiple Massachusetts Superior Court justices (not all of whom were women) heard testimony about the events from both Dismukes and EO and, finding EO to be more credible, repeatedly extended an abuse prevention order restraining Dismukes from having contact with EO.  Doc. No. 81 at 6-7, 19 & n.3.

In Count II, Dismukes claims Brandeis retaliated against him in violation of Title IX after he filed complaints in February 2017 with state and federal authorities alleging discrimination in connection with the informal investigation of EO's report.  While Dismukes's complaints plainly

8

constitute "protected activity" satisfying the first element of a Title IX retaliation claim, he has adduced no evidence that might plausibly support a finding that the adverse actions of which he complains were "causally linked" to that activity.  See Theidon v. Harvard Univ., 948 F.3d 477, 505 (1st Cir. 2020) (explaining proof necessary for prima facie case of retaliation).

The only adverse actions Dismukes identifies as having allegedly resulted from his protected activity are a November 2017 email he received from Brandeis's Dean of Students informing him he could not enter a particular building during a specified time period on one day later that month, Doc. No. 81 at 24, and an "on-going campaign to conspire with other employers to deny him employment," Doc. No. 75 at 39; see Doc. No. 74-23 (reflecting Dismukes learned on June 19, 2020 that he had not been selected for a job with the Department of Veterans Affairs ("VA")).  But besides the sequence of these events, Dismukes cites no evidence demonstrating that a "desire to retaliate was the but-for cause of" these actions.  Theidon, 948 F.3d at 505.  He has adduced no evidence demonstrating that the Dean of Students knew about the relevant protected activity before sending the relevant email.  He has adduced no evidence demonstrating that anyone at Brandeis (let alone anyone who knew about the protected activity) did anything to influence the hiring decisions of any employers to whom Dismukes had applied.  The Court notes here that Brandeis never imposed formal discipline on Dismukes.  His academic record and official transcript contain no reference to EO's report or the informal resolution rendered by Brandeis.  Where the Dean of Students sent the challenged email nine months after Dismukes's protected activity, and where the only evidence in the record revealing the timing of any adverse hiring decision is a rejection email Dismukes received more than three years after his protected

activity, reliance on a temporal link is patently insufficient to merit a trial on the retaliation claim.[9]

Accordingly, Brandeis's motion is allowed, and summary judgment will enter, as to Dismukes's Title IX claims.

B.       Contract Claims (Counts V, VI, and VIII)

In three claims, Dismukes alleges Brandeis's response to EO's report breached the express and implied promises conveyed in its student handbook.  Under settled Massachusetts law, the relationship between a private college and a student attending it is "contractual in nature," with the terms of the relationship "derived from student policy manuals."  Stonehill Coll., 2021 WL 706228, at *12.  Two tests potentially apply to Dismukes's claims that Brandeis breached its student handbook: one "ask[ing] whether the reasonable expectations of the parties" based on the terms of the handbook "have been met"; and another asking "whether the procedures followed [by Brandeis] were conducted with basic fairness."  Id. at *12-13.  Here, the former test considers "what meaning" Brandeis "should reasonably expect" a student in Dismukes's position to give to the relevant handbook provisions.  Id. at *12.  The latter test examines whether Brandeis "provided some minimum level of fair play to" Dismukes during the challenged process, but also accords "broad discretion" to Brandeis "in determining appropriate sanctions for violations of its policies."  Id. at *13.

At the outset, the parties disagree about which version of Brandeis's student handbook governed its response to EO's report and is pertinent to Dismukes's claims.  Dismukes relies on

---

[9] Dismukes's own introductory reference to his retaliation claim essentially concedes his inability to satisfy the critical causation element, characterizing Brandeis's actions as retaliatory " because the hostility" against Dismukes "continued"—not that it began—"after he filed formal harassment complaints" with state and federal officials.  Doc. No. 75 at 12.

the 2015-16 handbook, which he acknowledges having received when he enrolled in his Ph.D.

program, and which did not provide for an informal Title IX process.  Doc. No. 75 at 20-22;

Doc. No. 81 at 3-4.  Brandeis points to the amended version of the handbook it issued for the

2016-17 academic year, which it circulated to students (including Dismukes) via email in August

2016, and which introduced the informal process Dismukes now challenges.  Doc. No. 70 at 23-

24; Doc. No. 81 at 4-5.

This dispute is easily resolved in Brandeis's favor.  The incident in question happened in

late October 2016, well into the 2016-17 academic year and months after Brandeis notified

students of the amended student handbook in a communication which highlighted the precise

revisions at issue here.  Doc. No. 72-2; Doc. No. 81 at 4-5.  In these circumstances, the Court

finds that Brandeis should have reasonably expected its students, upon receiving notice of the

revision to the handbook, to understand that the amended version governed their conduct during

the 2016-17 academic year.  See Doe v. Brandeis Univ., 177 F. Supp. 3d 561, 596-97 (D. Mass.

2016) (explaining colleges are "clearly entitled" to amend handbooks and students have no

"contractual right to have disciplinary proceedings conducted under the specific procedures in

effect at the time of [their] matriculation").  Dismukes has not provided evidence creating a

dispute as to whether he received the relevant notice, and he has identified no plausible basis for

applying the prior year's handbook.[10]  Indeed, when deposed, he conceded "that the terms and

conditions of the 2016-2017 R&R Handbook governed his conduct as a Brandeis student during

that academic year."  Doc. No. 81 at 10.  Thus, the Court evaluates Dismukes's contract claims

---

[10] To the extent Dismukes argues that Brandeis was required to solicit formal acceptance of the revised handbook from each of its students and/or that the revisions were binding only for students who responded to the email notification, "had . . . dialogue" with Brandeis about the amendments, or otherwise expressed a "meeting of the minds" accepting the terms of the 2016-17 handbook, he is simply wrong.

using the 2016-17 handbook as the relevant agreement.  Considered as challenges arising

thereunder, Dismukes's contract-based claims fail under either applicable test.

### 1.    *Reasonable Expectations*

Even drawing inferences in Dismukes's favor, nothing in the record supports a

conclusion that the process employed by Brandeis diverged from the parties' reasonable

expectations under the plain language of the 2016-17 handbook.  The undisputed facts

demonstrate that EO's reports of the incident to Brandeis police, Waltham police, and the

Brandeis Department of Student Rights and Community Standards all described Dismukes as an

"ex-boyfriend" or a person she had previously dated.  Doc. No. 81 at 5-8.  Thus, each report is

fairly and most naturally read as describing an incident of dating or gender-based violence.[11]  A

student reading the handbook would reasonably expect that Brandeis would treat EO's

allegations as falling within the scope of Section 3, "Sexual Misconduct and Interpersonal

Violence," and triggering the informal process described in Section 23.  See Doc. No. 72-1 at 18

(specifying that "dating violence" is among the types of "gender-based misconduct" that are

subject to adjudication via the "Informal Title IX Process").

The undisputed facts further establish that Brandeis adhered to the procedures governing

an informal Title IX investigation as they are described in the handbook.  Compare Doc. No. 72-

---

[11] Though Dismukes now suggests the incident should have been adjudicated via mechanisms in place for other kinds of non-sexual and non-gender-based misconduct, there is no evidence in the record to support that view.  Indeed, all of the evidence before the Court bearing on the relationship between Dismukes and EO is to the contrary, supporting Brandeis's interpretation of EO's report as one of dating violence and/or gender-based harassment arising from a romantic, if casual and non-exclusive, relationship between a man and a woman.  Moreover, a university news reports describing town hall meetings that occurred more than a year before the relevant incident and eighteen months after it neither support Dismukes's assertion that Brandeis "was merely motivated to use" its "untested" informal Title IX process "to address the low reporting of sexual misconduct cases on campus" nor create a genuine dispute about a material fact warranting trial.  Doc. No. 75 at 13, 18; see Doc. Nos. 74-3, 74-14.

1 at 63-66 (providing the "Informal Title IX Process" may be used "upon request by the complaining party," and detailing the informal investigation followed in such cases), <u>with</u> Doc. No. 81 at 7-22 (describing EO's report of the incident, her request for the informal process, the lack of formal charges, the individuals assigned to perform the three major roles in the informal process, the steps taken to carry out the process as the handbook defined it, and the lack of formal findings of responsibility or imposition of disciplinary sanctions).[12]  A student reading the handbook would reasonably expect Brandeis to implement that process as it is described, and as Brandeis did here.  And, the process culminated in the application of protective measures expressly identified in the handbook's description of the informal process:  a No Contact Order and various restrictions on Dismukes's movements, and access to specified areas and programs, on campus.  Doc. No. 71-11 at 1-2; Doc. No. 72-1 at 65-66.

Dismukes does not identify, let alone cite record support showing, any way in which Brandeis's investigation of EO's report failed to follow the informal process set out in Section 23 of the handbook.  Rather, he asserts that various aspects of the process applied in his case and described in Section 23 of the handbook fell short of the level of "procedural fairness" he

---

[12] Dismukes summarily asserts in his brief that Brandeis has not offered evidence of EO's request for the informal process.  Doc. No. 75 at 24-25.  He is incorrect.  Brandeis has demonstrated the fact of EO's request via sworn affidavit by its general counsel.  Doc. No. 72 at 3.  Because Dismukes elected not to respond to Brandeis's factual statement as required by the relevant Federal and Local Rules and by Order of this Court, he has conceded Brandeis's properly supported statement of this undisputed fact.  In addition, he urges that the informal Title IX process was inappropriate here because its purpose of keeping matters internal to the university was undermined because, he claims, Brandeis (and not EO) initiated criminal charges against Dismukes for the same incident.  Doc. No. 75 at 23-24.  However, there is no evidence that Brandeis initiated criminal charges or any other external process; the undisputed facts establish otherwise.  <u>See</u> Doc. No. 81 at 6, 25 (stating "EO obtained" a restraining order and "EO pursued criminal charges"); <u>see also</u> Doc. No. 74-4 (stating in Brandeis police incident report that EO "told [the officer] that she wants to go to the Waltham District Court to apply for a restraining order").

expected.  Doc. No. 75 at 26-33.  But none of the protections Dismukes says he was not accorded by Brandeis are identified as components of the informal Title IX process.  Compare, e.g., id. (citing, inter alia, the lack of a formal appeal process and the inability to cross-examine witnesses), with Doc. No. 72-1 at 65-66 (containing no promise of a formal appeal or an opportunity to cross-examine witnesses); cf. Doc. No. 72-1 at 45, 45, 57 (expressly providing such rights in context of formal disciplinary proceedings arising under other sections of the handbook).  Thus, Brandeis would not reasonably expect its students to read the 2016-17 handbook as providing for such protections in the context of an investigation undertaken pursuant to Section 23, and no student reading that section of the handbook would reasonably expect such protections.[13]  In these circumstances, the record would not permit a jury applying the "reasonable expectations" test to find in Dismukes's favor on his contract claims.

        2.    *Basic Fairness*

After careful consideration of the totality of circumstances presented here, through the familiar lens of the summary judgment standard, the Court finds that the record does not create a material factual dispute as to the basic fairness of the process Brandeis used to investigate EO's report.  As another session of this Court has emphasized, there is "no one-size-fits-all answer to the question [of what] constitutes the 'basic fairness' that a student is due" in a school disciplinary proceeding.  Brandeis Univ., 177 F. Supp. 3d at 601.  Rather, assessment of this "uncertain and elastic concept" depends on "such factors as the magnitude of the alleged violation, the likely sanctions and other consequences of a finding of guilt, and the university's experience and aptitude in resolving disputes of that nature."  Id.  If Brandeis provided "some

---

[13] To the extent the same procedural complaints bear on the "basic fairness" of the informal process, they will be addressed more fully below.

minimum level of fair play" and did not act arbitrarily, capriciously, or in bad faith, then the

"basic fairness" requirement is satisfied. <u>Stonehill Coll.</u>, 2021 WL 706228, at *13; <u>accord</u>

<u>Sonoiki v. Harvard Univ.</u>, No. 19-cv-12172, 2020 WL 3416516, at *13 (D. Mass. June 22,

2020).

 Central to this analysis is the fact that Brandeis applied a less formal process than those at

issue in a vast majority (if not all) of the decisions addressing this question in courts throughout

this jurisdiction.  Those prior cases generally involved challenges to formal disciplinary charges

that resulted in expulsion or other sanctions documented in the student's official academic

records.  <u>E.g.</u>, <u>Stonehill Coll.</u>, 2021 WL 706228, at *3; <u>Sonoiki</u>, 2020 WL 3416516, at *6-7;

<u>Brandeis Univ.</u>, 177 F. Supp. 3d at 584-85.  The magnitude of the sanctions and other

consequences of formal proceedings in those cases necessarily entitled the accused students to a

more fulsome array of procedural protections in order to ensure basic fairness.  <u>See Brandeis</u>

<u>Univ.</u>, 177 F. Supp. 3d at 601-02 (emphasizing seriousness of accusation that student had

repeatedly and sometimes violently sexually assaulted his accuser over two-year period, severity

of potential sanctions ranging from ineligibility for campus housing to expulsion, and

significance of repercussions following disclosure of academic and disciplinary records

containing formal finding of responsibility for sexual misconduct).  Here, Brandeis's informal

process meant that no formal disciplinary charges, findings of responsibility, or sanctions were

levied against Dismukes, and no reference to EO's report or the outcome of the investigation

were memorialized in Dismukes's academic or disciplinary record.[14]  Because the stakes of the

informal process (both as it is described in the handbook and as it was implemented here) are

---

[14] There is nothing in the record suggesting Brandeis opted for the informal process here in bad
faith, to avoid providing Dismukes with greater procedural protections.  Indeed, the undisputed
facts establish that it followed this course at EO's request.

substantially lower than those posed by a more formal disciplinary proceeding, the procedural

protections necessary to ensure basic fairness are concomitantly reduced.[15]

The undisputed facts establish that Dismukes was provided a minimum level of fair play,

in the context of the informal process, and that the protective measures enacted at the conclusion

of the process were reasonable and limited.  Dismukes received notice of: interim protective

measures (a No Contact Order) implemented when Brandeis learned of the incident, Doc. Nos.

71-2, 71-3; the initiation of the informal Title IX process, Doc. No. 71-4; the participants and

steps in the process, id.; his ability to include his retained lawyer in the process as his advisor

(though not as his representative in lieu of his own participation), Doc. No. 71-5; his ability to

submit relevant information on his own behalf, Doc. No. 71-6; and the outcome of the

investigation, Doc. No. 71-11.  He participated in the process by providing his account of the

relevant events to the investigator, identifying witnesses he believed might be helpful (some of

whom the investigator interviewed), and submitting evidence he believed was pertinent (which

the investigator received and considered).  Though he did not bring his lawyer to his meeting

with the investigator, Brandeis did not prohibit or prevent him from doing so.

Dismukes requested permission to review the investigator's written report and,

eventually, Brandeis made the report available to him.  Doc. Nos. 71-12, 71-13.  Though he was

informed by the case manager that he should contact the Title IX coordinator if he had any

complaints or grievances following the outcome of the process, Doc. No. 74-11, nothing in the

record suggests he availed himself of the opportunity she described by raising objections either

---

[15] It is also worth noting that EO's accusations described a single instance of gender-based
harassment and dating violence.  Neither her accusations nor the report expressing the
investigator's findings labeled Dismukes a perpetrator of sexual assault.  This further
distinguishes the present case from many others cited by the parties, where the alleged
misconduct was more serious.

then or after the investigator's report was available to him.  And, at the conclusion of the process, Brandeis implemented only sensible protective measures tailored to the circumstances presented. See Doc. No. 71-11 (prohibiting Dismukes from attending in person classes in which EO was enrolled, limiting his ability to attend and participate in certain campus activities and events, and revoking his access to a private Ph.D. study room).  Though these measures no doubt impacted certain aspects of Dismukes's educational experience, the record establishes such impacts were limited and, in several instances, within Dismukes's control.[16]  See Doc. No. 71-11 (providing that limits on attendance and participation in campus activities and events would continue only until Dismukes completed specified online training courses, and that he could request and receive advance approval to attend certain seminars and events); Doc. No. 72-5 at 6, 10 (reflecting EO and Dismukes expected to be required to take only two or three more common courses as of the time of the investigation).

In these circumstances, the aspects of the process Dismukes now criticizes do not render it susceptible to a "basic fairness" challenge.  Because the record would not support a finding in Dismukes's favor on his contract claims under either the "reasonable expectations" or the "basic fairness" test, summary judgment is warranted on Counts V, VI, and VIII.[17]

---

[16] It was Dismukes's choice not to take the identified steps to eliminate or reduce the relevant restrictions.  Additionally, the Court notes nothing in the record suggests Dismukes asked Brandeis to revisit the protective measures at any time during the four years that have passed since their adoption, due to any change in circumstances or for any other reason.

[17] Count V alleges breach of contract, and it fails for the reasons discussed.  Count VI alleges breach of the implied covenant of good faith and fair dealing, and it suffers from the same deficiencies as the "basic fairness" theory of the contract claim.  See Doc. No. 70 at 25 n.15 (citing cases finding the same analysis applies to both types of claims).  And, Count VIII asserts quasi-contractual claims of estoppel and reliance, but such theories are unavailable where the relevant dispute is governed by a written agreement.  Brandeis Univ., 177 F. Supp. 3d at 612-13.

C.     Remaining Claims

None of the other eight claims Dismukes asserts merit substantial discussion, as they fail for reasons identified by Brandeis.  The Court will address each one briefly.

In Count III, Dismukes alleges that Brandeis conspired with the Commonwealth of Massachusetts and others to circumvent the lawyer representing him in the criminal matter arising from the same incident, and to produce to prosecutors private records generated during the informal Title IX process.  Doc. No. 1 at 41-42.  In his discovery responses, Dismukes narrowed this claim to one alleging that Brandeis (through one of its campus police detectives) conspired with EO to provide false testimony to the Waltham District Court in an effort to obtain a restraining order against Dismukes.  Doc. No. 71-15 at 22-23.  He appears to expand the claim again in his summary judgment brief, now suggesting a conspiracy that also included the VA and a scheme to deny Dismukes employment.  Doc. No. 75 at 47-52.  Regardless how it is characterized, Dismukes's conspiracy claim fails because the record contains no evidence from which a factfinder could reasonably infer an agreement of any sort among the purported conspirators, let alone one to engage in tortious conduct.[18]  See Snyder v. Collura, 812 F.3d 46, 52-53 (1st Cir. 2016) (discussing theories of civil conspiracy under Massachusetts law and their required elements).

---

[18] Such an agreement cannot be inferred from evidence that a campus police detective gave EO a pamphlet about restraining orders after speaking with her about the incident with Dismukes. There is no evidence remotely suggesting that the same detective, or any other Brandeis representative, urged EO to testify falsely.  Brandeis's production of its investigation records upon receiving a subpoena from state prosecutors is not evidence of a civil conspiracy or of any effort to undermine Dismukes's right to counsel.  And, the fact Dismukes was not hired for a job several years after Brandeis completed its informal investigation does not implicate the VA in a conspiracy of any sort.

In Count IV, Dismukes accuses Brandeis of violating his Sixth Amendment right to counsel by failing to permit his lawyer to represent him during the informal Title IX process, then producing to state prosecutors the report prepared as a result of that process.  Doc. No. 1 at 42-43.  This claim fails because the Sixth Amendment's guarantees extend only to criminal actions and, thus, could not have been violated by Brandeis in its internal and informal Title IX process.[19]

Dismukes asserts Brandeis was negligent and negligently inflicted emotional distress in counts IX and XIII, respectively.  Doc. No. 1 at 48, 52.  Under Massachusetts law, insofar as a school disciplinary process is concerned, a university owes a student no "additional independent duty outside of the[] existing contractual relationship."  Doe v. Trs. of Bos. Coll., 892 F.3d 67, 94 (1st Cir. 2018).  Thus, a student's remedy for an alleged violation of the terms of a student handbook or for harm allegedly caused by the manner in which a defined disciplinary process is implemented "must sound in contract, not in tort."  Id.  The absence of "an independent duty outside of the contractual relationship between" Dismukes and Brandeis dooms both of Dismukes's claims that are grounded in principles of negligence.[20]  See id. at 94-95 (affirming entry of summary judgment on negligence and negligent infliction of emotional distress claims).

---

[19] Dismukes was told his lawyer could participate in the informal process as an "advisor," but not as counsel or as a substitute for Dismukes participating on his own behalf.  That Dismukes and/or his lawyer declined to proceed in that fashion is not the fault of Brandeis.  Additionally, Brandeis's production of its records to state prosecutors in response to a valid subpoena in no way deprived Dismukes of his right to legal representation in the criminal action.  To the extent Dismukes now recharacterizes this claim as a Due Process challenging to the informal Title IX process or as a claim under the Fifth Amendment, Doc. No. 75 at 39-41, he did not plead such claims in his Complaint and both would fail in any event.  A Due Process claim would suffer the same shortcomings identified above with respect to the contract claims considered under the "basic fairness" test, and a Fifth Amendment claim is unavailable here for the same reasons his Sixth Amendment claim cannot proceed.

[20] Dismukes cannot cure the lack of an independent legal duty by endeavoring in his brief to expand his negligence claims to encompass Brandeis's production of records in response to the

In Count X, Dismukes alleges Brandeis defamed him by "leaking information" to third parties about the report prepared as a result of the informal Title IX investigation, and has also aided and abetted EO in defaming him via false statements made in court hearings regarding her restraining order against him.  Doc. No. 1 at 48-50; accord Doc. No. 75 at 47, 52-54.  This claim fails on any and all theories alleged for reasons ably explored in Brandeis's memorandum and adopted by reference here.  Doc. No. 70 at 27-30 (citing cases and explaining lack of record support for a finding that the statements about which Dismukes complains were false, damaging to his reputation, and published, as required to sustain a defamation claim).

Next, and relatedly, Dismukes alleges in Count XI that Brandeis invaded or interfered with his privacy in violation of a Massachusetts statute.  Doc. No. 1 at 50-51.  As Brandeis observes, such a claim requires proof that Brandeis "disclos[ed] facts of highly personal or intimate nature" and "had no legitimate reason for doing so."  Doc. No. 70 at 30 (quoting Spencer v. Roche, 755 F. Supp. 2d 250, 271-72 (D. Mass. 2010)).  The record is entirely devoid of evidence that Brandeis disclosed any information arising from its informal Title IX process to any of Dismukes's professors or prospective employers.  Insofar as Dismukes bases this claim on Brandeis's production of information to state prosecutors, the valid subpoena to which Brandeis was responding plainly provides a "legitimate reason" for the disclosure and forecloses a claim under the statute Dismukes cites.

In Count XII, Dismukes claims Brandeis intentionally inflicted emotional distress in its handling of EO's report.  Doc. No. 1 at 51-52.  It is only the rare case, however, where a

---

criminal subpoena it received from state prosecutors or the supervision and training of its Title IX staff.  Doc. No. 75 at 44-47.  Again, no such claims were alleged in his Complaint.  And, his conclusory and unsupported assertions at this juncture are insufficient to avoid entry of summary judgment.

university's handling of student misconduct proceedings—even if "unreasonable and unfair"—will surmount the "very high" bar marking the sort of "extreme and outrageous" conduct that is "beyond all possible bounds of decency," "intolerable in a civilized community," and necessary to sustain a claim of intentional infliction of emotional distress. Brandeis Univ., 177 F. Supp. 3d at 617. Nothing in the record would permit a factfinder to conclude that this is such a case.

Finally, Dismukes seeks assorted declarations in Count XIV, all of which are aimed at redressing the effects of conduct that already has occurred, and all of which hinge on the success of one or more of the claims that precede this one. Doc. No. 1 at 53-54. Because his request for declaratory judgment does not concern the "future legal rights of the parties," and because all of Dismukes's substantive claims fail for reasons already explained, summary judgment is warranted as to this claim as well. See Doc. No. 70 at 32-33 (citing cases).

Accordingly, the undisputed facts entitle Brandeis to entry of judgment as a matter of law on Counts III, IV, IX, X, XI, XII, XIII, and XIV.

III.    CONCLUSION

For the foregoing reasons, Brandeis's motion for summary judgment (Doc. No. 68) is ALLOWED, Dismukes's "motion" in opposition (Doc. No. 74) is TERMINATED, and Dismukes's motion to deny or defer ruling on summary judgment (Doc. No. 80) is DENIED. A separate judgment shall issue.

SO ORDERED.

  /s/ Leo T. Sorokin
United States District Judge